CROWN KOSHER SUPER MARKET OF MASS., INC., Corporate Plaintiff,

and

Irving Heafitz, Morris Chaitovsky and Ruth B. Cohen, suing on behalf of themselves and others similarly situated and Rabbi Moses D. Sheinkopf, Chief Orthodox Rabbi of the United Orthodox Congregations of Springfield and President of the Massachusetts Council of Rabbis, suing on behalf of himself and other Rabbis similarly situated, Individual Plaintiffs,

v.

Raymond P. GALLAGHER, Chief of Police of the City of Springfield, Massachusetts, Defendant.

No. 58–471–M.

United States District Court
D. Massachusetts.

May 18, 1959.

Dissenting Opinion June 5, 1959.

On Petition for Rehearing
July 20, 1959.

McCarthy, J., dissented.

Herbert B. Ehrmann, Samuel Markell, Edward L. LaVine, Goulston & Storrs, Boston, Mass., Irving S. Ribicoff, David Kotkin, Ribicoff & Kotkin, Hartford, Conn., Samuel L. Fein, Fein, Cavanaugh & Kimball, Springfield, Mass., for plaintiffs.

S. Thomas Martinelli, Asst. City Sol., Matthew J. Ryan, Jr., City Sol., John J. O'Connor, Asst. City Sol., Springfield, Mass., for defendant.

Joseph H. Elcock, Jr., Asst. Atty. Gen., Edward J. McCormack, Jr., Atty. Gen., for Commonwealth of Massachusetts, amicus curiae.

Leo Pfeffer, New York City, for International Religious Liberty Ass'n, amicus curiae.

Howard S. Whiteside, Boston, Mass., for Southern New England Conference of Seventh Day Adventists, amicus curiae.

Henry M. Leen, Boston, Mass., for Archdiocesan Council of Catholic Men, amicus curiae.

Herbert S. Avery, Boston, Mass., for The Lord's Day League of New England, amicus curiae.

Before MAGRUDER and WOODBURY, Circuit Judges, and McCARTHY, District Judge.

MAGRUDER, Circuit Judge.

It is always an unpleasant task for a lower federal court to sit in review upon the constitutionality of state legislation, but sometimes a three-judge district court can find no escape from doing that, under 28 U.S.C. §§ 1331, 1343, 2281 and 2284. We believe the present to be such a case.

The attack which we have to consider is upon the validity, under the Federal Constitution, of the modern version of what started as one of the famous "blue laws" enacted by the Great and General Court of Massachusetts in colonial days. Specifically, we refer to the so-called "Lord's day" statute, still on the books in Massachusetts. M.G.L.A. c. 136 § 1 et seq. So far as we are aware, the Supreme Judicial Court has had no occasion to pass on the validity of this statute under the Federal Constitution, though that court has, rather gingerly and briefly, upheld the statute against attacks based upon the state Constitution. See Commonwealth v. Has, 1877, 122 Mass. 40; Commonwealth v. Chernock, 1957, 336 Mass. 384, 145 N.E.2d 920.

The federal complaint now before us seeks a declaration that certain provisions of the "Lord's day" statute of Massachusetts are unconstitutional, as applied to the plaintiffs. Preliminary and final injunctions restraining the defendant, the Chief of Police of the City of Springfield, from enforcing against the plaintiffs the criminal provisions of the law were asked for. A three-judge court was designated to hear the suit, pursuant to the provisions of 28 U.S.C. §§ 2281 and 2284. The motion for a preliminary injunction was not pressed,

after the parties had informally agreed that the plaintiffs would not be prosecuted until after decision of this case. The defendant filed a motion to dismiss, which was consolidated with the hearing on the merits before this court.

Counsel for the Commonwealth has appeared to oppose the relief prayed, and by leave of court consolidated briefs were filed on behalf of two pairs of amici curiae, The Lord's Day League of New England and the Archdiocesan Council of Catholic Men, arguing that the statute should be upheld, and the International Religious Liberty Association, together with the Southern New England Conference of Seventh Day Adventists, urging that the statute is unconstitutional.

Joined as plaintiffs were Crown Kosher Super Market of Mass., Inc., a corporation operating a kosher supermarket in Springfield, Massachusetts, three named customers thereof, suing on behalf of themselves and others similarly situated, and a rabbi suing on behalf of himself and other rabbis similarly situated.

Most of the facts were stipulated by the parties, but some additional oral and documentary evidence was presented by the plaintiffs at the hearing before us.

The corporate plaintiff's supermarket (hereinafter called the Crown Market) offers for sale all categories of food ("one stop shopping"); all of its meats and meat products are kosher, and something like 95 per cent of the rest of its stock is kosher. The Crown Market is the only store of this kind in the area of Springfield; apparently it is the only one within 26 miles or more.[1] But Springfield has several kosher butcher shops and some delicatessen shops and supermarkets which sell certain kosher products.

The four officers and stockholders and the six directors of the corporate plaintiff are all adherents of the Orthodox Jewish faith, who duly observe the Jewish Sabbath, from sundown Friday to sundown Saturday. A very substantial percentage of the corporate plaintiff's customers are Orthodox Jews, and most of the others are Conservative Jews who observe the Jewish Sabbath.

The due observance of the Jewish Sabbath requires total abstinence from business and work of even the most trivial sort. Any riding in automobiles or other conveyances and walking extraordinary distances are forbidden. With particular reference to this case, the religious belief of the officers, directors and stockholders of the corporate plaintiff completely precludes the operation of the store on the Jewish Sabbath, since that would be doing business vicariously and causing others to work on the Sabbath. The large majority of Crown Market's customers, who share these beliefs, may not shop on the Sabbath, nor may they cook. Preparation for meals during the 24 hours of the Jewish Sabbath, and especially for the traditional family feast on Friday night, consumes most of the daylight hours on Friday.

It follows that the Crown Market (like other kosher stores) is not open for business between sundown Friday and sundown Saturday, and on thirteen Jewish holidays each year. Even if the store were open on Saturday, the great majority of its patrons could not take advantage of it, just as they cannot take advantage

---

1. The testimony that the nearest similar store was in Hartford, Connecticut (about 26 miles to the south), was not rebutted, and is corroborated by the fact that the list of customers attached to the complaint contains names of persons coming from the following towns in addition to Springfield (approximate distance and direction from Springfield are noted parenthetically):

Brattleboro, Vt. (60 mi. N)
Pittsfield, Mass. (53 mi. WNW)
Athol, Mass. (50 mi. NE)
Turners Falls, Mass. (43 mi. NNE)
Greenfield, Mass. (39 mi. N)
Ware, Mass. (25 mi. ENE)
Holyoke, Mass. (12 mi. NNE)
Westfield, Mass. (9 mi. W)
Enfield, Conn. (9 mi. S)
Agawam, Mass. (4 mi. SSW)
Longmeadow, Mass. (3 mi. S)
W. Springfield, Mass. (3 mi. W)

of the other stores which are open Friday night and Saturday and sell some kosher food. Business considerations make operation on Saturday night impracticable. If, after sundown, the store were prepared for business (for instance, by cutting meat) and were then opened, few hours would remain before a suitable closing time; the twelve store employees (six of whom are butchers) would demand extra wages for their trouble, and most customers would find it inconvenient, if not impossible, to shop during those night hours, especially those who would have to travel significant distances starting after sundown.

But it is common knowledge that the normal pattern of a grocery store's business shows a gradual increase in volume, from very little business on Monday to somewhat more during the day on Friday. The stores are jammed and a vast amount of business is done on Friday evening and Saturday. Since the Orthodox and Sabbath-observing Conservative Jews, such as the customers of the corporate plaintiff, cannot shop on Friday night or Saturday, and they have spent the Sabbath as a day of rest or religious celebration and family communion, Sunday is the only day which has for them the advantages as a shopping day that Saturday has for the majority of the people.

Under these circumstances, it is not surprising that more than one-third of Crown Market's gross sales each week are made on Sunday. It would not be practicable for Crown Market to sell only kosher meat from 6 A.M. to 10 A.M. on Sunday, as permitted by law, for economic reasons similar to those preventing operations on Saturday night after sundown. The few sales would not justify the great expense.

The Crown Market is open for business from 8 A.M. to 6 P.M. every Sunday, and has been open every Sunday (excluding Jewish holidays) since it was established August 18, 1953. It thus has been and is violating the statute, the constitutionality of which is being attacked in this proceeding. The manager of the Crown Market (who is also the corporate plaintiff's president and owns 50 per cent of the stock thereof) was convicted of violation of the challenged provisions of the Lord's day law in the Massachusetts state court. His exceptions in that trial, which questioned the constitutionality of the law under the state constitution but raised no federal constitutional issue, were overruled by the Supreme Judicial Court. Commonwealth v. Chernock, supra, 1957, 336 Mass. 384, 145 N.E.2d 920. Even if the defendant had pleaded res judicata (which he has not, see Rule 8(c), F.R. Civ.P., 28 U.S.C.A.), it seems obvious enough that the corporate plaintiff is not bound by Commonwealth v. Chernock, nor is any of the individual plaintiffs.

The defendant threatens to enforce the law to the full extent of his authority. Thus it must be taken that he will institute repeated criminal prosecutions against the corporate plaintiff, its four officers and stockholders, and its six directors and twelve employees, for each violation, that is, for each Sunday on which Crown Market is open for business.

Two of the three named customer-plaintiffs are residents of Springfield and the third is a resident of Turners Falls, 43 miles to the north. All are Orthodox Jews who are regular customers of the corporate plaintiff's store. These three customers adequately represent a class of Orthodox Jewish people of the area served by the corporate plaintiff's store; they seek to enforce, by obtaining a common relief, their several rights which depend, however, on common questions of law and fact within the meaning of Rule 23(a)(3), F.R.C.P.

The named plaintiff-rabbi is the Chief Orthodox Rabbi of The United Orthodox Congregations of Springfield and is the president of the Massachusetts Council of Rabbis. He has been duly authorized by the latter organization to represent it in the prosecution of this action. Besides his religious duties as leader and teacher

of his congregation, this rabbi has the duty (which he may and in fact does discharge through an inspector appointed by him) of inspecting kosher markets and butcher shops daily except on the Jewish Sabbath to ensure compliance with Jewish dietary laws. The inspector comes to the Crown Market at 8 A.M. on Sunday for the washing of any meat from animals slaughtered on the previous Thursday which is on hand. Among the dietary rules enforced is that fresh meat must be rewashed every 72 hours, that only meats and seafood of certain kinds and quality may be eaten, and that meat and dairy products must not be commingled, even by the use of the same implements for both. We think that the plaintiff-rabbi adequately represents a class, and that this class seeks to enforce by a common relief certain common rights and certain several rights which depend upon common questions of law and fact within the meaning of Rule 23 (a)(1) and (3), F.R.C.P.

Preliminarily the defendant relies upon a point of equity jurisdiction based upon the justifiable reluctance of federal courts of equity to interfere by way of injunction with the operation of a state criminal statute. As stated in Spielman Motor Sales Co., Inc. v. Dodge, 1935, 295 U.S. 89, 95, 55 S.Ct. 678, 680, 79 L.Ed. 1322, "there must be exceptional circumstances and a clear showing that an injunction is necessary in order to afford adequate protection of constitutional rights." In Douglas v. City of Jeannette, 1943, 319 U.S. 157, 63 S.Ct. 877, 880, 87 L.Ed. 1324, in which similar language occurs, the actual decision was that the bill should be dismissed for "want of equity", since an injunction against enforcement of the ordinance was unnecessary because, in parallel litigation, the Supreme Court had already adjudicated that the ordinance was unconstitutional. Murdock v. Commonwealth of Pennsylvania, 1943, 319 U.S. 105, 63 S.Ct. 891, 87 L.Ed. 1292.

It would be nice if we could say to these plaintiffs, "Go ahead and violate the challenged statute, and urge your defense based upon federal constitutional grounds in the course of the state court proceeding." But the matter is not so simple as that. It seems clear, from the recent decision in Evers v. Dwyer, 1958, 358 U.S. 202, 79 S.Ct. 178, 3 L.Ed.2d 222, that when enforcement of a state criminal statute results in the denial of civil rights of a citizen and the state officials intend to enforce the statute unless and until its unconstitutionality has been finally adjudicated, a three-judge district court may not decline as a matter of discretion to take jurisdiction of a suit to enjoin the operation of the statute. Furthermore, this argument by the defendant really relates only to the corporate plaintiff. Because there is an exception in the statute that permits persons situated as are the plaintiff-customers and the plaintiff-rabbis to perform "secular business and labor" on Sunday, these particular individual plaintiffs cannot, either by shopping at the corporate plaintiff's store or by inspecting it, or by any other act in the capacities in which they appear here, violate the Sunday law. It is evident that for them the *only* method by which they can vindicate the constitutional rights claimed is by obtaining equitable relief.

As stated in the complaint, the grounds for challenging the Sunday law are all founded upon the Fourteenth Amendment. Simply stated, these are: (1) That the Lord's day law is a law respecting the establishment of religion and denying the free exercise of religion and hence is violative of the due process clause of the Fourteenth Amendment. See Douglas v. City of Jeannette, supra, 319 U.S. at page 162, 63 S.Ct. at page 880; (2) that the statute deprives the corporate plaintiff of its property and the other plaintiffs of their liberty arbitrarily and therefore is a denial of due process of law guaranteed by the Fourteenth Amendment; and (3) that the statute denies the corporate plaintiff the equal protection of the laws guaranteed by the Fourteenth Amendment. It can hardly be disputed that the corporate plaintiff has standing to assert the

grounds numbered 2 and 3 supra, and that the individual plaintiffs have standing to assert the grounds numbered 1 and 2 supra. If we were required to go into the matter, which we are not now, we would be prepared to hold that the facts of this case bring it squarely within the exception to the Supreme Court's "rule of practice" forbidding one party to assert somebody else's constitutional rights, so that all plaintiffs could argue all grounds. See Pierce v. Society of Sisters, 1925, 268 U.S. 510, 45 S.Ct. 571, 69 L.Ed. 1070; Pearl Assurance Co., Limited, of London, England v. Harrington, D.C.Mass.1941, 38 F.Supp. 411, affirmed 1941, 313 U.S. 549, 61 S.Ct. 1120, 85 L.Ed. 1514; Bartels v. State of Iowa, 1923, 262 U.S. 404, 410–411, 43 S.Ct. 628, 67 L.Ed. 1047; Barrows v. Jackson, 1953, 346 U.S. 249, 73 S.Ct. 1031, 97 L.Ed. 1586.

It is clear that the first Sunday law, enacted in 1653, and the various modified versions thereof also enacted in the colonial period, had the religious purpose to compel a seemly observance of that day of the week celebrated as the Sabbath (Sunday) by the dominant Christian sect. See Colonial Laws of Mass. 132–33, 134; Mass. Bay Province Acts 1692–93, c. 22; 1716–17, c. 13; 1727–28, c. 5; 1760–61, c. 20. See also the codification of 1782, passed by the legislature assembled under the Constitution of the Commonwealth of Massachusetts. Mass. Acts 1782, c. 23. These enactments were prior to the adoption of the Constitution of the United States and long before the adoption of the Fourteenth Amendment.

In enactments subsequent to the creation of the Federal Union, the Massachusetts legislature began to eliminate some provisions from the earlier prohibitory clauses of its Sunday laws. See Mass. Acts 1791, c. 58; R.S.1836, c. 50.

In 1858 the legislature, apparently yielding to various pressure groups, commenced the practice of writing in various exceptions to the general prohibition against secular activities on the Lord's day, which has resulted in amendments by some seventy-odd different enactments.[2]

The result of all this is that the Sunday law, as it now exists on the books, is an almost unbelievable hodgepodge. Chapter 136 of the Massachusetts General Laws, entitled "Observance of the Lord's day", contains in § 5 the general prohibition which defendant is threatening to apply to the plaintiffs: "Whoever on the Lord's day keeps open his shop, warehouse or workhouse, or does any manner of labor, business or work, except works of necessity and charity, shall be punished by a fine of not more than fifty dollars." (There is no doubt that the "Lord's day" as used in the statute means Sunday.) Then § 6 and the succeeding sections contain miscellaneous exceptions and qualifications, none of which do these plaintiffs any good. One of such exceptions might have seemed as an original matter to be applicable to the corporate plaintiff. It is provided in one part of § 6: "Nor shall it prohibit the performing of secular business and labor on the Lord's day by any person who conscientiously believes that the seventh day of the week ought to be observed as the Sabbath and actually refrains from secular business and labor on that day, if he disturbs no other person thereby". But the Supreme Judicial Court has held, and of course that court's interpretation of the state statute is binding upon us, that this

2. Mass.Acts 1858, c. 151; 1881, c. 119; 1886, c. 82; 1887, c. 391; 1893, c. 41; 1895, c. 434, 1897, c. 389; 1900, c. 440; 1901, c. 80; 1902, c. 414; 1904, c. 460; 1906, c. 139; 1908, cc. 123, 126, 273, 333, 343, 354, 385, 537; 1909, cc. 420, 423; 1910, c. 327; 1911, c. 328; 1914, c. 757; 1916, c. 146; 1917, c. 207; 1918, c. 257; 1920, cc. 141, 240; 1922, c. 119; 1928, cc. 234, 406; 1929, c. 118; 1930, cc. 90, 143, 179; 1931, cc. 41, 71, 174, 176, 240, 275, 426; 1932, cc. 96, 105; 1933, cc. 150, 309; 1934, cc. 55, 63, 354; 1935, cc. 78, 104, 169; 1936, c. 129; 1937, c. 286; 1938, cc. 60, 143; 1943, c. 473; 1945, c. 575; 1946, cc. 207, 318; 1948, c. 119; 1949, c. 190; 1950, cc. 256, 322, 681; 1951, cc. 32, 504; 1954, cc. 132, 217; 1955, cc. 255, 304, 524, 742; 1956, cc. 11, 157, 212, 256.

particular exception does not excuse the separate offense of keeping one's shop open on the Lord's day, although the defendant in conscience believes that the seventh day of the week ought to be observed as the Sabbath and actually refrains from secular business on that day. Commonwealth v. Has, supra, 122 Mass. 40. To the same effect see Commonwealth v. Kirshen, 1907, 194 Mass. 151, 80 N.E. 2; Commonwealth v. Starr, 1887, 144 Mass. 359, 11 N.E. 533.

Much is made by the defendant of the following extract from the opinion of the Supreme Judicial Court in Commonwealth v. Has, supra, 122 Mass. at page 42:

"This act has been so frequently recognized in both civil and criminal cases, and its various provisions have been so often the subject of judicial decision, that its constitutionality can hardly be considered an open question. It is essentially a civil regulation, providing for a fixed period of rest in the business, the ordinary avocations and the amusements of the community. If there is to be such a cessation from labor and amusement, some one day must be selected for the purpose; and even if the day thus selected is chosen because a great majority of the people celebrate it as a day of peculiar sanctity, the legislative authority to provide for its observance is derived from its general authority to regulate the business of the community and to provide for its moral and physical welfare. The act imposes upon no one any religious ceremony or attendance upon any form of worship, and any one, who deems another day more suitable for rest or worship, may devote that day to the religious observance which he deems appropriate. That one who conscientiously observes the seventh day of the week may also be compelled to abstain from business of the kind expressly forbidden on the first day, is not occasioned by any subordination of his religion, but because as a member of the community he must submit to the rules which are made by lawful authority to regulate and govern the business of that community."

This description of the Massachusetts Sunday law as being merely a "day-of-rest" statute, enacted pursuant to the police power, is answered by an examination of the statute, particularly those numerous provisions which permit various activities on Sunday, which certainly are not "works of necessity and charity", at specified hours and places designed not to affront godly persons worshiping in their churches during the usual morning hours. Moreover, the exceptions, permitting a great variety of functions on Sunday, are not by § 6 made conditional upon the observance of some other day in the week as a day of rest. In fact there is on the statute books a wholly separate requirement, Mass. G.L. c. 149, § 48, imposing upon employers of labor the obligation to see to it that their employees are allowed "at least twenty-four consecutive hours of rest, which shall include an unbroken period comprising the hours between eight o'clock in the morning and five o'clock in the evening, in every seven consecutive days." The characterization of the Sunday law as being merely a civil regulation providing for a "day of rest" seems to have been an *ad hoc* improvisation in Commonwealth v. Has, supra, because of the realization that the Sunday law would be more vulnerable to constitutional attack under the state Constitution if the religious motivation of the statute were more explicitly avowed. At any rate, that characterization of the statute is contradicted by other pronouncements of the Supreme Judicial Court both before and after the date of the decision in Commonwealth v. Has. See, for instance, Pearce v. Atwood, 1816, 13 Mass. 324, 345–346; Bennett v. Brooks, 1864, 91 Mass. 118, 121; Davis v. City of Somerville, 1880, 128 Mass. 594, 596; Commonwealth v. White, 1906, 190 Mass. 578, 580–581, 77 N.E. 636, 637, 5 L.R.A.,N.S., 320. In the last-named case, blissfully

474

ignoring what was said in Commonwealth v. Has, the Supreme Judicial Court said:

"In construing this statute it is to be borne in mind that, so far as material to the question before us, it is simply the continuation of a law which, from a very early time in the history of the colony, has been constantly upon our statute books. It is one of a series of statutory provisions enacted to secure the proper observance of the Lord's day, as understood by our forefathers. Their idea of the Lord's day, the manner in which it should be spent, and the object of the system of statutes passed from time to time to secure its proper observance, are set forth in the various preambles to those statutes. One of these is in the following language: 'Whereas it is the duty of all persons, upon the Lord's day, carefully to apply themselves, publickly and privately to religion and piety, the prophanation of the Lord's day is highly offensive to Almighty God, of evil example, and tends to the grief and disturbance of all pious and religiously disposed persons, therefore,' etc. See Prov. St. 1760–61, c. 20, § 1; 4 Prov. Laws, (State ed.) 415. Perhaps the most instructive preamble is that which precedes St. 1791, p. 351, c. 58, which was the first general statute passed on this subject after the adoption of our State Constitution. It reads as follows: 'Whereas the observance of the Lord's Day is highly promotive of the welfare of a community, by affording necessary seasons for relaxation from labor and the cares of business; for moral reflections and conversation on the duties of life, and the frequent errors of human conduct, for public and private worship of the Maker, Governor and Judge of the world and for those acts of charity which support and adorn a Christian society: And whereas some thoughtless and irreligious persons inattentive to the duties and benefits of the Lord's Day, profane the same, by unnecessarily pursuing their worldly business and recreations on that day, to their own great damage, as members of a Christian society; to the great disturbance of well disposed persons, and to the great damage of the community, by producing dissipation of manners and immoralities of life: Be it therefore enacted,' etc. Such was the idea of the Lord's day for the observance of which this system was devised."

In fact, the joint brief filed by The Lord's Day League of New England and the Archdiocesan Council of Catholic Men "lets the cat out of the bag", so to speak, in the following statement: "Each organization has various aims and purposes, but have, in common, the purpose of preventing the further secularization and commercialization of the Lord's Day."

Fortunately, in passing upon the constitutionality of the state statute, we do not have to accept the characterization of it made in Commonwealth v. Has, supra. See Society for Savings in City of Cleveland, Ohio v. Bowers, 1955, 349 U.S. 143, 151, 75 S.Ct. 607, 99 L.Ed. 950.

It seems to us that all the objections which have been taken under the Fourteenth Amendment to the constitutionality of the statute in question are well taken.

As to the freedom of religion provisions of the First Amendment which the Supreme Court has explicitly told us have been incorporated into the due process clause of the Fourteenth Amendment and have thus become binding on the states, see Thornhill v. State of Alabama, 1940, 310 U.S. 88, 95, 60 S.Ct. 736, 84 L.Ed. 1093; Douglas v. City of Jeannette, supra, 1943, 319 U.S. 157, 162, 63 S.Ct. 877, 87 L.Ed 1324; Thomas v. Collins, 1945, 323 U.S. 516, 65 S.Ct. 315, 89 L.Ed. 430.

We may start with the classic statement from Everson v. Board of Education, 1947; 330 U.S. 1, 15–16, 67 S.Ct. 504, 511, 91 L.Ed. 711:

"The 'establishment of religion' clause of the First Amendment means at least this: Neither a state nor the Federal Government can set up a church. Neither can pass laws which aid one religion, aid all religions, or prefer one religion over another. Neither can force nor influence a person to go to or to remain away from church against his will or force him to profess a belief or disbelief in any religion. No person can be punished for entertaining or professing religious beliefs or disbeliefs, for church attendance or nonattendance. No tax in any amount, large or small, can be levied to support any religious activities or institutions, whatever they may be called, or whatever form they may adopt to teach or practice religion. Neither a state nor the Federal Government can, openly or secretly, participate in the affairs of any religious organizations or groups and *vice versa.* In the words of Jefferson, the clause against establishment of religion by law was intended to erect 'a wall of separation between church and State.' Reynolds v. United States, 1878, 98 U.S. [145] at page 164, 25 L.Ed. 244."

To the above may be added the statement by the Court in the Everson case, 330 U.S. at page 18, 67 S.Ct. at page 513:

"State power is no more to be used so as to handicap religions, than it is to favor them."

What Massachusetts has done in this statute is to furnish special protection to the dominant Christian sects which celebrate Sunday as the Lord's day, without furnishing such protection, in their religious observances, to those Christian sects and to Orthodox and Conservative Jews who observe Saturday as the Sabbath, and to the prejudice of the latter group. It is clear that by denying to the plaintiffs the liberty to work, shop, or pursue other "secular" conduct on Sunday, the law puts an economic penalty upon a person observing as his Sabbath some other day than Sunday by depriving him of the productive use of one further day of the week. In other words, whereas ordinary grocery stores are open six days a week, if the challenged law is constitutional the Crown Market can be open only five days, and none of these five days would include a day of the week end, when a large percentage of the week's sales is normally obtained. Even assuming that the Crown Market could stay in business on such a basis, it could do so only under great handicap as against other supermarkets. Crown Market's Orthodox customers also lose much of the value of their Sunday under the same penalty, since if the law is constitutional they may not shop on either Saturday or Sunday. Without doubt if they remain faithful to their religious convictions, they will be under a very substantial disadvantage as compared with shoppers whose Sabbath is observed on Sunday. The rabbi-plaintiffs would be hindered in their function of supervising the food to be eaten by the members of their congregations, and they would also suffer great detriment in their efforts to preserve, in these circumstances, due observance of the Jewish Sabbath and of the dietary laws by them.

For reasons closely related to those just set forth, the objection is well taken that, in furtherance of no legitimate interest which Massachusetts is entitled to safeguard, the statute arbitrarily requires Crown Market to be closed on Sunday, thereby causing the corporate plaintiff to lose potential sales and to be denied the right to use its property on Sunday, with the result of depriving the corporate plaintiff of liberty and property and the other plaintiffs of liberty, without due process of law, contrary to the Fourteenth Amendment.

We think in addition that, on the decided cases, the discriminations apparent on the face of the statute constitute a denial of the equal protection of the laws, forbidden as well by the Fourteenth Amendment. See Smith v. Cahoon, 1931, 283 U.S. 553, 51 S.Ct. 582, 75 L.Ed. 1264; City of Springfield v. Smith, 1929, 322 Mo. 1129, 19 S.W.2d 1; Allen v. City of

476

Colorado Springs, 1938, 101 Colo. 498, 75 P.2d 141; City of Mt. Vernon v. Julian, 1938, 369 Ill. 447, 17 N.E.2d 52, 119 A.L.R. 747; Ex parte Hodges, 1938, 65 Okl.Cr. 69, 83 P.2d 201; Arrigo v. City of Lincoln, 1951, 154 Neb. 537, 48 N.W. 2d 643; Henderson v. Antonacci, Fla. 1952, 62 So.2d 5.

Without elaborating the many discriminatory exceptions, two vices may be noted as examples: The statute does not generically forbid the keeping open of a store on Sunday to sell food, but it just limits this liberty to selected types of stores.[3] Employees of the favored stores are not less in need of rest than those of the Crown Market, nor does any reason appear why the operation of those stores

is less calculated to disturb the rest of citizens than do the operations of the Crown Market. And many classes of work which are excepted are surely no less destructive of public rest and relaxation than the opening of the Crown Market would be.[4]

We ought to comment briefly on two Supreme Court cases much relied upon by the defendant.[5] In Hennington v. State of Georgia, 1896, 163 U.S. 299, 16 S.Ct. 1086, 41 L.Ed. 166, the only claim considered by the Court was that, under the commerce clause, a state could not prohibit the running of a railroad train in interstate commerce on Sunday. The Court held simply that congressional silence could not foreclose the field to

3. (1) Bakers and their employees may sell during specified hours any food customarily sold by them, and milk as well. (2) Persons who raise fruits and vegetables and their agents may sell the same and milk also on any property they own, during all hours on Sunday. (3) Licensed innholders and licensed common victualers may sell frozen desserts, frozen dessert mix, confectionery, soda water, milk and tobacco, on Sunday, and during certain hours may sell bread. (4) Persons who sell fruit, frozen desserts, frozen dessert mix, confectionery and soda water "on secular days" and are especially licensed, may sell the same and milk all day Sunday, and during certain hours may sell bread. (5) Druggists may sell confectionery, soda water, frozen desserts, frozen dessert mix, milk and tobacco during all hours on Sunday. (6) News dealers whose stores are open every other day of the week (thus excluding Sabbath-observing Jews) may sell milk and tobacco at all times on Sunday. (7) Shops operated and staffed by persons who because of conscientious beliefs duly observe Saturday as the Sabbath may sell kosher meat and milk *only until 10 A.M.*

4. For instance, the persons operating the Crown Market (or the plaintiff customers) could dig ditches, or do any other type of labor, if that were their ordinary calling, and apparently could even vend food outside the store building. Moving such business indoors cannot reasonably be thought to make it more disruptive of a day of rest and recreation.

Other provisions are equally whimsical: When Rosh Hashonoh or Yom Kippur begins at sundown Sunday, fish, fruit and

vegetables may be sold until 12 noon; but kosher meat may only be sold until 10 A.M. One may dig for clams on Sunday, but may not dredge for oysters. All professional sports are permitted (under certain conditions) from 1:30 to 6:30 P.M., and hockey, basketball and baseball may run much longer; but amateur sports are tolerated (under the same conditions) only between 2 and 6 P.M. Bowling alleys at amusement parks may open until 12 midnight, whereas other bowling alleys must close at 11 P.M.

5. In another case, Friedman v. People of State of New York, 1951, 341 U.S. 907, 71 S.Ct. 623, 95 L.Ed. 1345, the United States Supreme Court without opinion dismissed, for lack of a substantial federal question, an appeal from a decision by the New York Court of Appeals upholding a "Sunday law" of that state upon the ground that the statute simply provided in reasonable terms for a day of rest. People v. Friedman, 1950, 302 N.Y. 75, 96 N.E.2d 184. That case is clearly distinguishable from the one at bar; the statutes attacked are quite different. The New York law has few characteristics or roots in history tending to indicate that it is a religious regulation; and the New York courts have consistently interpreted it as a civil regulation, whereas the Massachusetts statute has most often been construed as a religious law. Nor does the New York statute contain such prolix and irrational exceptions to its prohibitions as those which dominate the Massachusetts statute before us. Perhaps this is why counsel supporting the statute in the present case have placed such slight reliance on the Friedman case.

state regulation. The opinion assumed that the statute was for the purpose of securing a day of rest, as the Georgia Supreme Court had held, and reasoned from this premise (163 U.S. at page 307, 16 S.Ct. at page 1089). Also, it may be pointed out that this is a pretty old case, which was decided before the modern development of limitations upon the powers of the states implicit in the Fourteenth Amendment. In Petit v. State of Minnesota, 1900, 177 U.S. 164, 20 S.Ct. 666, 667, 44 L.Ed. 716, the Supreme Court did affirm a conviction under a Minnesota statute, M.S.A. §§ 614.29, 614.30, prohibiting all labor on Sunday "excepting the works of necessity or charity." The statute contained the provision that keeping open a barber shop on Sunday "shall not be deemed a work of necessity or charity." The Court sustained the conviction of the defendant barber on alternate grounds: (1) That "necessity or charity" did not as a matter of fact include barber shops, so that the proviso really added nothing, and (2) even if barber shops might otherwise be excused from closing, it could not be said that the classification in the circumstances was unreasonable, since courts will take judicial notice of the fact that, in view of the custom of keeping barber shops open in the evening as well as in the day, the employees in them work more, and during later hours, than those engaged in most other occupations.

This opinion shall constitute the findings of fact and conclusions of law in accordance with Rule 52(a), F.R.C.P.

The form of our decree pursuant to the foregoing opinion will be settled by counsel upon due notice.

McCARTHY, J., dissents from the opinion and judgment of the Court, and will file a dissenting memorandum at a later date.

McCARTHY, District Judge (dissenting).

The plaintiffs here, a corporation and some individuals who are officers, stockholders or allegedly customers of the corporate plaintiff, and an Orthodox Jewish rabbi, sought by complaint to have a statutory three-judge court convene to determine the constitutionality of Section 5 of Chapter 136 of the General Laws of the Commonwealth of Massachusetts. The defendant is the Chief of Police of the City of Springfield wherein the corporate plaintiff has its place of business. The court permitted one joint amicus curiae brief to be filed by intervening parties for each side of the question.

The plaintiffs filed a motion for a preliminary injunction which was never acted upon by the court. The defendant filed a motion to dismiss. As the record in this case will show, the hearing was devoted largely to arguments on the motion to dismiss. Some evidence was taken on the merits and various stipulations were filed with the court.

I am in complete disagreement with my colleagues on the court as to what constitute the facts in this case. The corporate plaintiff is managed by one Chernock, who is a director and the owner of 50% of its stock. In 1957 the Supreme Judicial Court of Massachusetts affirmed a judgment of conviction against Chernock on three complaints charging him with a violation of the precise section of the General Laws of Massachusetts, the constitutionality of which has been challenged in this proceeding. Commonwealth v. Chernock, 336 Mass. 384, 145 N.E.2d 920. In the state proceedings the cases were submitted to the Supreme Court on an agreed statement of facts which differs radically from what has been accepted by this Court as the basic facts in issue.

Paragraph 5 of the complaint alleges that the corporate plaintiff is " * * * selling food to Orthodox and Conservative Jewish persons, prepared in accordance with the tenets of their religion." Paragraph 11 of the complaint alleges that "Crown Market is a completely Kosher Supermarket". The foregoing allegations and other language in the complaint would lead one to believe that the corporate plaintiff is engaged exclusively in the sale of Kosher meats and

foodstuffs having a religious significance. In support of the allegations of the complaint, Chernock testified that he was the owner of 50% of the stock of the corporation and that approximately 95% of its sales were of Kosher foods. Chernock further testified that some foodstuffs were sold to non-Jewish customers on Sundays.

On the other hand in the case of Commonwealth v. Chernock, supra, 336 Mass. at page 385, 145 N.E.2d at page 921, the Massachusetts Supreme Judicial Court in its opinion stated as follows: "The cases were submitted on the following agreed facts. The defendant conducts a combination *Kosher* and *Super Market* which, because of its religious convictions, is closed to business every Saturday and Jewish holiday but remains open to business on Sundays. On the days specified in the complaint, which were Sundays, the plaintiff kept his market open after 10:00 o'clock in the forenoon and until closing time and did sell *to the public* Kosher meats, *bakery goods, vegetables* and *canned goods of all types.*" (Emphasis added.)

It is most disturbing to observe the discrepancies between the allegations of the complaint in this case and the agreed upon facts in the state court case. Quite obviously both cases are concerned with the same market and the same individual in the person of Chernock.[1] The inference from the language of the complaint is that the corporate plaintiff is engaged exclusively in the business of selling Kosher meat and Kosher food products—

as witness the words "a completely Kosher market". On the other hand, the agreed statement of facts in the state court case make it clear that the market sells to the public all kinds of vegetables, groceries and bakery goods in addition to Kosher meats and Kosher foods—as witness the words "a combination Kosher and Supermarket". There are no limitations in the corporate plaintiff's charter, a certified copy of which I am annexing to this opinion, as to the character of foods it may sell. It would appear to me that in a case of this magnitude involving as it does the striking down of a state statute, there should be no doubt or confusion as to the facts. The court should know whether this market is a store for the sale of religious foods, if one may use that expression, or whether it is a supermarket selling all kinds of food to the general public. If it be the latter, as is indicated by the agreed statement in the state court case, then the fears expressed in the majority opinion that the religious rights of some persons are not being safeguarded may be laid at rest. In that event we need look no further to find the reason for the great volume of sales on Sundays, which would appear to be the very obvious reason that the corporate plaintiff's competitors are closed on Sundays observing the general day of rest prescribed by the laws of Massachusetts. It is therefore my opinion that if the decision in this case is to turn in any degree on the factual situation, the interests of justice would best be served by reopening

---

1. The defendant's bill of exceptions in the state court cases establishes the identity of the defendant in that case with the plaintiff in the instant case. For example, the defendant therein filed a motion to dismiss which was captioned "Commonwealth v. Harold Chernock D/B/A Crown Market". The defendant's brief in that case under the heading "Issue No. 2" raised the same issues that are raised here, namely freedom of religion and equal protection of the law under the Massachusetts Constitution and Declaration of Rights. The same defenses under the First and Fourteenth Amendments were available to the defendant in the state court case. After conviction in the Superior Court of Massachusetts (the trial court), a bill of complaint was brought in that court by the defendant for the purpose of restraining the authorities from enforcing the law pending the outcome of an appeal to the Supreme Judicial Court. It is noteworthy that the petitioner in that complaint is "Crown Kosher Super Market of Mass., Inc. alias Harold Chernock D/B/A Crown Market." Copies of these documents are being filed in the Clerk's office of the U.S. District Court at Boston.

the case in this court for the purpose of taking testimony to establish the truth.

On the assumption that the alleged facts accepted by the court as to the nature and extent of the corporate plaintiff's business are of no significance, and on the further assumption that the sole issue before the court is whether or not the Commonwealth of Massachusetts may constitutionally enact a statute providing for the general closing of shops, warehouses and workhouses on Sunday, then I would allow the motion to dismiss on the basis that this Court will not and should not exercise its equitable powers to prevent enforcement of a state criminal statute where an adequate means to test the validity of the statute in the state court exists. Spielman Motor Sales Co., Inc. v. Dodge, 295 U.S. 89, 55 S.Ct. 678, 79 L.Ed. 1322. The complaint before the Court does not allege that irreparable harm will be suffered by the plaintiffs if this Court should refer the plaintiffs to their remedies in the state court and before the Supreme Court of the United States by way of certiorari.

The majority would exercise equitable power on the basis of the holding in Evers v. Dwyer, 358 U.S. 202, 79 S.Ct. 178, 3 L.Ed.2d 222, to the effect that a three-judge district court may not decline to take jurisdiction of a suit to enjoin operation of a state criminal statute where the enforcement of the statute results in the denial of civil rights of a citizen and the state officials intend to enforce the statute. Assuming, only for the moment, that enforcement of the state statute in question could deprive one of the alleged plaintiffs of a civil right it is apparent from the stipulation of fact filed by the parties and from the majority opinion itself that the state court stands ready to enjoin enforcement of the statute pending adjudication and that the defendant stands ready to refrain from enforcing the statute pending adjudication.

The majority opinion further admits that this concerns only the corporate plaintiff for the individual plaintiffs, under existing Massachusetts law, cannot be charged with violation of this statute. The majority make a very tenuous argument that the only way that the individual plaintiffs may "vindicate the constitutional rights claimed is by obtaining equitable relief." The so-called constitutional right claimed by the individual plaintiffs is the asserted right to purchase food at any hour and this asserted right allegedly flows from the constitutional rights to liberty and to the free exercise of religion. In essence the sole complaint of the individual plaintiffs is that it is inconvenient to be unable to shop at all hours on Sunday. This was frankly admitted by counsel for the plaintiffs in argument. Transcript pp. 50, 61. I believe that the individual plaintiffs are before the Court as "window dressing" to enable the corporate plaintiff to rely upon arguments that freedom of religion has been infringed and thereby help the corporate plaintiff to gain a commercial competitive advantage. For these reasons I would hold that none of the alleged plaintiffs has presented an infringement of a substantial right and that the requirements of Evers v. Dwyer, supra, have not been met. I would relegate the plaintiff corporation and alleged plaintiffs to the state courts for their remedies.

Since the majority opinion goes to the merits of the case I feel that I would be remiss in my duties if I did not state my views upon the merits.

There are two basic issues here presented:

1. Is the statute in question religious in nature?

2. If not religious in nature does the statute violate the equal protection clause of the Fourteenth Amendment?

People of State of Illinois ex rel. McCollum v. Board of Education, 333 U.S. 203, 68 S.Ct. 461, 92 L.Ed. 648 and Everson make it clear that a statute which aids a religion or all religions or no religion or favors one religion over another is unconstitutional as a violation of the Fourteenth Amendment. Those cases both turn upon the question of the ex-

**480**

penditure of public funds in aid of religion. On this point they are distinguishable. The cases do not declare unconstitutional a legislative enactment which recognizes the existence of a Supreme Being. The "high wall of separation" imported into those cases is fiscal in nature.[2]

Many examples of constitutional enactments recognizing the existence of a Supreme Being or of organized religion could be cited. A few are: the appointment of chaplains for the Armed Forces and for houses of legislature; the words "In God We Trust" upon currency; the inclusion of "under God" in the pledge of allegiance; draft exemptions for clergymen and conscientious objectors; tax exemptions for religious organizations.

The statute before the Court is not religious in nature in the sense of McCollum and Everson. It provides for no expenditure of public funds in furtherance of any or all religions.[3] It compels no religious observation nor does it interfere with any person's religious practices. In the absence of a definitive statement by the state court as to the meaning or federal constitutionality of the state statute, this Court would be bound to pass upon these questions if properly presented. Doud v. Hodge, 350 U.S. 485, 76 S.Ct. 491, 100 L.Ed. 577. The converse is also true. It is for the highest court of the state to tell us the meaning and application of a state statute. State of Minnesota ex rel. Pearson v. Probate Court, 309 U.S. 270, 273, 60 S.Ct. 523, 84 L.Ed. 744; United States v. Burnison, 339 U.S. 87, 89, 70 S.Ct. 503, 94 L.Ed. 675; In re Murchison, 349 U.S. 133, 135, 75 S.Ct. 623, 99 L.Ed. 942. This Court must give weight to the expression of the state court. In the instant case there

have been many expressions of the meaning of the state statute by the Supreme Judicial Court. These expressions have also made clear the federal constitutionality of the state statute.

It is clear that the statute before the court had some religious intent in its initial form. The preambles to the early enactments make this fact obvious. In the majority opinion much is made of this circumstance. For my part the fact that a statute has religious roots is not disturbing at all. Many of our laws have religious roots which lie deep in the religious background and traditions of the American people.[4] Frankly, I can think of no better roots that a law might have. The statute, however, providing as it does for a day of rest and cessation from business activities is clearly within the police power of the state and no apologies need be made for its history and origin.

The Supreme Judicial Court of Massachusetts had occasion to pass upon the question now before this Court in 1876, long before the inclusion of the First Amendment in the Fourteenth and long before the development of the line of cases exemplified by McCollum and Everson. In these circumstances it cannot be said that the Supreme Judicial Court was writing its way around constitutional prohibitions or that the police power theory is recent contrivance.

The legislative intent in this statute was stated in Commonwealth v. Has, 122 Mass. 40, 42, as follows: "This act has been so frequently recognized in both civil and criminal cases, and its various provisions have been so often the subject of judicial decision, that its constitutionality can hardly be considered an open question. It is essentially a civil regulation, providing for a fixed period of rest

2. See complete discussion of the source of this phrase in Reynolds v. United States, 98 U.S. 145, 162–164, 25 L.Ed. 244.

3. See Doremus v. Board of Ed., 342 U.S. 429, 72 S.Ct. 394, 96 L.Ed. 475.

4. By Executive Order and Presidential Proclamation, Christmas is designated each year as a holiday. This day, commemorating as it does the birth of

Christ, is celebrated as a day of rest and cessation from business. No day could have deeper or more significant religious roots, yet if the reasoning of the majority is carried to its logical conclusion, such Presidential Proclamation contravenes the Constitution in its application to all persons, including non-Christian inhabitants of the United States.

in the business, the ordinary avocations and the amusement of the community. If there is to be such a cessation from labor and amusement, some one day must be selected for the purpose; and even if the day thus selected is chosen because a great majority of the people celebrate it as a day of peculiar sanctity, the legislative authority to provide for its observance is derived from its general authority to regulate the business of the community and to provide for its moral and physical welfare. The act imposes upon no one any religious ceremony or attendance upon any form of worship, and anyone, who deems another day more suitable for rest or worship, may devote that day to the religious observance which he deems appropriate. That one who conscientiously observes the seventh day of the week may also be compelled to abstain from business of the kind expressly forbidden on the first day, is not occasioned by any subordination of his religion, but because as a member of the community he must submit to the rules which are made by lawful authority to regulate and govern the business of that community."

In Commonwealth v. White, 190 Mass. 578, 580, 77 N.E. 636, the Supreme Judicial Court referred to the preambles to the early enactments of the statute which sound in the day of rest purpose and in the religious observation purpose. This case does not hold that the statute is religious in purpose and intent. There the Court was concerned with what is "work of necessity" and determined that commercial cranberry picking was not a work of necessity within the meaning of the statute. The issue of religious freedom was not before the Court.

The language quoted above from Commonwealth v. Has has been recently affirmed in Commonwealth v. Chernock, 336 Mass. 384, 145 N.E.2d 920.

A thorough study of the Constitution of the Commonwealth of Massachusetts and the construction placed upon it by its highest court furnishes convincing proof that this state is second to none in the safeguarding and preservation of the rights and privileges of all of its inhabitants. The Constitution of Massachusetts in Part I, Article II, guarantees to all the freedom of religion. Part I, Article III, provides among other things that "all religious sects and denominations * * * shall be equally under the protection of the law; and no subordination of any one sect or denomination to another shall ever be established by law." (Inserted in 1833 by the Eleventh Article of Amendment.)

Article XVIII of the Articles of Amendment, after reasserting the freedom of religion, prohibits the use of any public funds for "any church, religious denomination or society." (Inserted in 1917 by the Forty-Sixth Article of Amendment.)

These provisions of the Constitution of Massachusetts and many decisions of the Supreme Judicial Court indicate the scrupulous concern that the Commonwealth has for the rights, privileges and immunities of its inhabitants. In Volume 6 of the Opinions of the Attorney General (1922) at page 483, is to be found the statement that the Constitution of Massachusetts "guarantees life, liberty and property, and equal protection to the same extent as does the Fourteenth Amendment."

It should not be inferred, however, that the Constitution of Massachusetts reflects any indifference towards religion and religious values. In its Preamble there is an acknowledgment by its framers of the "goodness of the great Legislator of the universe", and a prayer for "His direction" in the establishment of the Constitution. Part I, Article II, declares that "it is the right as well as the duty of all men in society, publicly and at stated seasons to worship the Supreme Being, the great Creator and Preserver of the universe." Part I, Article III, contains the following language " * * * the public worship of God and instructions in piety, religion, and morality, promote the happiness and prosperity of a people and the security of a republican government." In In re Opinion of the Justices, 214 Mass. 599, at page 601, 102 N.E. 464,

the Supreme Judicial Court said: "The Constitution of the commonwealth [Massachusetts] in several clauses inculcates the practice of religion and urges the public worship of God as essential means for the perpetuation of republican institutions. But in emphatic and unmistakable terms, it guarantees to all our people absolute freedom as to religious belief and liberty unrestrained as to religious practices, subject only to the conditions that the public peace must not be disturbed nor others obstructed in their religious worship or the general obligations of good citizenship violated." That these guarantees exist for all, whether Christian or non-Christian, is settled beyond doubt by the decision of Glaser v. Congregation Kehillath Israel, 263 Mass. 435, 161 N.E. 619. In that case, 263 Mass. at page 437, 161 N.E. at page 620, it was said: "These great guarantees of religious liberty and equality before the law of all religions are not confined to adherents of the Christian religion or to societies and corporations organized for the promotion of Christianity. They extend likewise to the adherents of the ancient religion whose sacred scriptures form a part of the Bible. We are of the opinion that Jews as well as Christians are protected by these explicit declarations of religious equality."

I have deemed it necessary to cite these provisions of the fundamental laws of Massachusetts and these few excerpts from the opinions of its highest court in view of the reference by the majority of this court to the decision of Commonwealth v. Has as being an "ad hoc improvisation" and to other similar references to the interpretation placed by the Supreme Judicial Court upon the laws of the Commonwealth. The majority of this court has seen fit to label the Supreme Court's construction of the statute in the Has case as a "characterization" rather than as a construction of the law of Massachusetts.

I see nothing in the Constitution of Massachusetts, the decisions of its highest court, or the law now under attack, that warrants this court to challenge either the spirit of the law or the motives of that court. I perceive no occasion here to go behind the construction of the law of a sovereign state, placed upon it by its own highest court, which would appear to me to be in a better position to interpret its own law than this court. If there be occasions for a federal court to question the motives of the highest court of a state in construing its own statutory law, this is not one of them.

The Supreme Court of the United States has had two occasions to pass upon and to uphold statutes against claims that they violated the establishment of religion clause of the First Amendment or the clause banning any statute which prohibited the free exercise of religion contained in the same amendment. These cases are illustrative of many similar decisions by the Supreme Court of the United States. I select them because of the applicability of their language and because I think that they should be contrasted with the authority of the majority.

In Reynolds v. United States, 98 U.S. 145, 25 L.Ed. 244, the Court was faced with a defense to the charge of polygamy based upon the religious beliefs of the defendant. At pages 162–167, of 98 U.S. the Court said: " * * * (T)he question is raised whether religious belief can be accepted as a justification of an overt act made criminal by the law of the land. The inquiry is not as to the power of Congress to prescribe criminal laws for the Territories, but as to the guilt of one who knowingly violates a law which has been properly enacted, if he entertains a religious belief that the law is wrong.

"Congress cannot pass a law for the government of the Territories which shall prohibit the free exercise of religion. The First Amendment to the Constitution expressly forbids such legislation. Religious freedom is guaranteed everywhere throughout the United States, so far as congressional interfer-

ence is concerned. The question to be determined is, whether the law now under consideration comes within this prohibition.

"The word 'religion' is not defined in the Constitution. * * * The precise point of the inquiry is, what is the religious freedom which has been guaranteed.

\* \* \* \* \* \*

"* * * Congress was deprived of all legislative power over mere opinion, but was left free to reach actions which were in violation of social duties or subversive of good order.

\* \* \* \* \* \*

"* * * Laws are made for the government of actions, and while they cannot interfere with mere religious belief and opinions, they may with practices.

\* \* \* \* \* \*

"So here, as a law of the organization of society under the exclusive dominion of the United States, it is provided that plural marriages shall not be allowed. Can a man excuse his practices to the contrary because of his religious belief? To permit this would be to make the professed doctrines of religious belief superior to the law of the land, and in effect to permit every citizen to become a law unto himself. Government could exist only in name under such circumstances."

In Zorach v. Clauson, 343 U.S. 306, 72 S.Ct. 679, 96 L.Ed. 954, the Court was faced with a refinement of the "released time" program of McCollum in the sense that there was no expenditure of public funds to house the religious training classes or to oversee the children en route to the classes. In a six to three split the Court upheld the statute over objections that the statute violated the first and second clauses of the First Amendment. It was held that the state may cooperate with and recognize the existence of organized religion. At page 313 of 343 U.S., at page 684 of 72 S.Ct. it was said:

"We are a religious people whose institutions presuppose a Supreme Being."

In differing conditions the Supreme Court of the United States has passed upon statutes requiring the cessation of either all or some business on Sunday. In 1885, in Soon Hing v. Crowley, 113 U.S. 703, at page 710, 5 S.Ct. 730, at page 734, 28 L.Ed. 1145 the Court said, "Laws setting aside Sunday as a day of rest are upheld, not from any right of the government to legislate for the promotion of religious observances, but from its right to protect all persons from the physical and moral debasement which comes from uninterrupted labors. Such laws have always been deemed beneficial and merciful laws, especially to the poor and dependent, to the laborers in their factories and workshops, and in the heated rooms of our cities; and their validity has been sustained by the highest courts of the states." In Hennington v. State of Georgia, 163 U.S. 299, 16 S.Ct. 1086, 41 L.Ed. 166, in 1896, the Supreme Court set out the rule and the answer at pages 303–304, of 163 U.S. at page 1088 of 16 S.Ct., "The well-settled rule is that if a statute purporting to have been enacted to protect the public health, the public morals, or the public safety has no real or substantial relation to those objects, or is a palpable invasion of rights secured by the fundamental law, it is the duty of the courts to so adjudge, and thereby give effect to the Constitution. * * * It (the statute) is none the less a civil regulation because the day on which the running of freight trains is prohibited is kept by many under a sense of religious duty. The legislature having, as will not be disputed, power to enact laws to promote the order and to secure the comfort, happiness, and health of the people, it was within its discretion to fix the day when all labor, within the limits of the state, works of necessity and charity excepted, should cease. It is not for the judiciary to say that the wrong day was fixed, much less that the legislature erred when it assumed that the best interests of all re-

quired that one day in seven should be kept for the purposes of rest from ordinary labor."

The 1950 case of People v. Friedman, 302 N.Y. 75, 96 N.E.2d 184, upheld a similar statute against the same objections of interference with religious freedom. The Court of Appeals for the State of New York recognized that the Sunday laws were religious in origin but were maintained by the legislature for public health and safety purposes. On appeal to the Supreme Court of the United States a motion to dismiss was granted on the basis that no substantial federal question was presented. Friedman v. People of State of New York, 341 U.S. 907, 71 S.Ct. 623, 95 L.Ed. 1345.

With regard to the comment in the footnote in the majority opinion on Friedman v. People of State of New York, 341 U.S. 907, 71 S.Ct. 623, 95 L.Ed. 1345, People v. Friedman, 302 N.Y. 77, 96 N.E.2d 184, the following is pertinent:

The footnote asserts that the "New York law has few characteristics or roots in history tending to indicate that it is a religious regulation". The fact is that People v. Friedman, at 96 N.E.2d 186, asserts that "the so-called Sunday laws may be said to have a religious origin". The case goes on to say that even if the Sunday law to-day (i.e. in 1950) is penal in nature, Sunday is now set aside as a day of rest as wise and necessary to set apart for both the physical and moral welfare of a state or community.

With reference to this footnote, attention should be drawn to the preliminary report of the joint legislative committee on Sabbath Law, State of New York, Legislative Document (1952), No. 50, published by Williams Press, Inc., Albany, New York, in 1952. This legislative document (at page 11) gives the chronology of New York laws both colonial and state. The first Sunday law from a New York colony was enacted in 1664 and was known as the "Duke of York's Laws". In 1685, the General Assembly passed the first New York Colonial statute on the subject—a bill against Sabbath breaking. Generally this Colonial statute forbade worldly labor, business, or work of ordinary callings, prohibited traveling and sports and any exercises except works of necessity or charity. In 1695 the Colonial Assembly enacted another act against profanation of the Lord's Day, prohibiting traveling, servile labor, and working, etc.

In 1778 an act for suppressing immorality was first passed in New York as a state. This act repeated almost verbatim the prohibitions of the 1695 law. During the next hundred years there are only a few minor changes.

Finally, in 1881 the Penal Code was adopted and the prohibitions against work, labor, business, and sports were arranged in separate sections. Aside from the section on public traffic on Sunday, and the section on public sports on Sunday, there were very few amendments to the Sabbath article from 1881 to 1952, a period of approximately seventy years.

Section 2140 of the New York Penal Code, McKinney's Consol.Laws, c. 40, entitled "The Sabbath", sounds the keynote of the Sabbath article in the following language: "The first day of the week being by general consent set apart for rest and religious uses, the law prohibits the doing on that day of certain acts hereinafter specified, which are serious interruptions of the repose and religious liberty of the community".

How then, can the footnote state that the New York statute has few characteristics or roots in history tending to indicate that it is a religious regulation, when the legislature of the State of New York specifically designated it as regulating a religious day for a period of over approximately 170 years and when the statute had colonial roots extending back for a further period of 114 years?

As to the statement that the Massachusetts statute is dominated by "prolix

and irrational exceptions", with the intimation that the New York statute was not so characterized, it might be pertinent to point out that the Legislative Document No. 50 (1950) above referred to has as its "Preamble" the following statement from the annual message to the Legislature by Governor Thomas E. Dewey under date of January 9, 1952:

"The Penal Law provisions on Sabbath observations date back many years. The original broad provisions have been whittled away through the years by numerous exceptions and the present provisions create an illogical and inconsistent pattern. Although it is legal to conduct professional baseball, football, and soccer games on Sunday in many communities, it is illegal to conduct other sporting events and activities similar to those which are permitted. There are many other incongruities and examples of disparate treatment. Many activities which do not interfere with the religious repose of the community are prohibited by existing law. There is need for a careful re-examination of these provisions. I recommend that your honorable bodies establish a joint legislative committee to study the problems".

It is significant that the Governor of the State of New York clearly recognized that Sabbath Day regulations was a matter for the Legislature, and he merely indicated that the law could be modernized to permit "activities which do not interfere with the religious repose of the community." To the intimation of the footnote on the Friedman case that the New York statute has few roots in history tending to indicate that it is a religious regulation, the true characteristics and roots of the statute may be found in expressions indicating a religious connotation from colonial laws in 1664 to the recommendation of the Governor of the State in 1952.

This brings us to the second issue, that of equal protection. With the religious issue disposed of, the possibility of violation of equal protection arises from the exceptions to the statute. So long as the exceptions are not unreasonable on their face we have no power to pass upon them. Smith v. Cahoon, 283 U.S. 553, 566–567, 51 S.Ct. 582, 587, 75 L.Ed. 1264, "The principle that the state has broad discretion in classification in the exercise of its power of regulation is constantly recognized by the decisions of this Court (citing cases). But the constitutional guaranty of equal protection of the laws is interposed against discriminations that are entirely arbitrary. In determining what is within the range of discretion and what is arbitrary, regard must be had to the particular subject of the state's action."

"1. The equal-protection clause of the 14th Amendment does not take from the state the power to classify in the adoption of police laws, but admits of the exercise of a wide scope of discretion in that regard, and avoids what is done only when it is without any reasonable basis, and therefore is purely arbitrary. 2. A classification having some reasonable basis does not offend against that clause merely because it is not made with mathematical nicety, or because in practice it results in some inequality. 3. When the classification in such a law is called in question, if any state of facts reasonably can be conceived that would sustain it, the existence of that state of facts at the time the law was enacted must be assumed. 4. One who assails the classification in such a law must carry the burden of showing that it does not rest upon any reasonable basis, but is essentially arbitrary." Lindsley v. Natural Carbonic Gas Co., 220 U.S. 61, 78–79, 31 S.Ct. 337, 340, 55 L.Ed. 369.

The Supreme Judicial Court of Massachusetts has adopted similar standards for determining the constitutionality of a legislative enactment and has used language particlularly applicable here.

"The plaintiff contends that the statute imposes an arbitrary and unreasonable restriction upon its right to conduct

its business, and deprives it of its property without due process of law in violation of the Fourteenth Amendment to the Constitution of the United States and of arts. 1 and 10 of the Declaration of Rights of the Constitution of Massachusetts and by the Fourteenth Amendment to the Constitution of the United States. And the right to engage in such a business or occupation carries with it the making of contracts, the advertising of goods, the solicitation of customers, and the adoption of the various means that are usually employed to encourage trade and to extend the market for goods. Holcombe v. Creamer, 231 Mass. 99, 108, 109, 120 N.E. 354; In re Opinion of the Justices, 271 Mass. 598, 601, 171 N.E. 234; Louis K. Liggett Co. v. Baldridge, 278 U.S. 105, 113, 49 S.Ct. 57, 73 L.Ed. 204; New State Ice Co. v. Liebmann, 285 U.S. 262, 278, 52 S.Ct. 371, 76 L.Ed. 747. But one cannot conduct his business or pursue his occupation in any way he may desire. He is subject to reasonable regulations designed to protect the public interest. A reasonable regulation governing the sales of property does not deprive the owner of his property without due process of law. Commonwealth v. Crane, 162 Mass. 506, 39 N.E. 187; Commonwealth v. Libbey, 216 Mass. 356, 103 N.E. 923, 49 L.R.A.,N.S., 879; Nebbia v. People of State of New York, 291 U.S. 502, 54 S.Ct. 505, 78 L.Ed. 940; Pacific States Box & Basket Co. v. White, 296 U.S. 176, 56 S.Ct. 159, 80 L.Ed. 138.

\* \* \* \* \* \*

" \* \* \* The Legislature possesses a large measure of discretion to determine what the public interests require and what means should be taken to protect those interests. The field for the legitimate exercise of police power is coextensive with the changing needs of society. The record does not negative the existence of any of the possible findings that have been mentioned. All rational presumptions are in favor of the validity of an act of the legislative department of the government. Perkins v. Inhabitants of Westwood, 226 Mass.

268, 115 N.E. 411. Moore v. Election Commissioners of Cambridge, 309 Mass. 303, 35 N.E.2d 222; Morrissey v. State Ballot Law Commission, 312 Mass. 121, 130, 43 N.E.2d 385.

\* \* \* \* \* \*

"One assailing a statute on constitutional grounds has the burden of proving the absence of any conceivable grounds upon which the statute may be supported. 'As underlying questions of fact may condition the constitutionality of legislation of this character, the presumption of constitutionality must prevail in the absence of some factual foundation of record for overthrowing the statute.' O'Gorman & Young, Inc. v. Hartford Fire Ins. Co., 282 U.S. 251, 257–258, 51 S.Ct. 130, 135, 72 A.L.R. 1163. 'The burden is not sustained by making allegations which are merely the general conclusions of law or fact. \* \* \* Facts relied upon to rebut the presumption of constitutionality must be specifically set forth.' Pacific States Box & Basket Co. v. White, 296 U.S. 176, 185, 56 S.Ct. 159, 163, 80 L.Ed. 138. \* \* \*

\* \* \* \* \* \*

"The contention of the plaintiff that the statute imposes an arbitrary and unreasonable restriction upon its business cannot be sustained." Merit Oil Co. v. Director of Division of Necessaries of Life, 319 Mass. 301, 302–306, 65 N.E.2d 529, 530.

Testing the statute before the Court by each of the tests set out I believe that the answer must be in favor of the validity of the statute. Essentially the test is whether or not the exceptions are reasonable or are so arbitrary that this Court would be warranted in invading the province of the General Court of Massachusetts. Each of these exceptions was engrafted upon the statute at a different time and each was engrafted by vote of the legislature of Massachusetts. Careful analysis of the exceptions warrants the conclusion that each exception either allows the operation of a busi-

ness which the General Court has determined is necessary or serves as an aid to the achievement of the rest and relaxation for which the legislature has set aside the day.

The late Chief Justice of the Supreme Court of the State of New Jersey, in an opinion upholding the state statute which banned the sale of automobiles on Sunday, said, "The State has an absolute right to enter here and force on all and everyone so engaged regulations for the benefit of the public, and it is not for the court to say that its action in doing so is contrary to the constitutional provisions against discrimination merely because there are classes similarly situated with respect to the public or social evils requiring similar legislation that are yet unregulated. * * * " Gundaker Central Motors v. Gassert, 23 N.J. 71, 127 A.2d 566, 573. An appeal to the Supreme Court of the United States was dismissed for failure to present a substantial federal question. 354 U.S. 933, 77 S.Ct. 1397, 1 L.Ed.2d 1533.

I would ordinarily say nothing further but I believe that the opinion of the majority demands some comment by me. The factual statements of the majority opinion contain some unwarranted assumptions. They state that business considerations make operation of the corporate plaintiff's store on Saturday night impracticable. If the store closed at 10 p.m. on Saturday night an average of four hours business could be conducted for most months of the year. It should be borne in mind that it is alleged that the customers of the corporate plaintiff's store are not casual passers-by nor persons who treat it as a convenient corner grocery. It is the basis of the complaint that the customers inconvenience themselves to shop at the store. The corporate plaintiff would pay no more to have its employees work on Saturday night and Sunday morning than it already pays them to work all day Sunday. I do not agree that Saturday night and Sunday morning operation within the statute would be impracticable.

The majority of the Court also state that it is common knowledge that a grocery store's business is concentrated on Friday evening and Saturday. This contradicts the equally common knowledge that supermarketeering has changed the buying habits of the consumer and has tended to level out the volume of business of grocery stores. Based on a mis-assumption as to the buying habits of the consuming public the majority of the Court attribute the Sunday volume of the corporate plaintiff's store to the buying habits of Orthodox and Conservative Jews. This volume might as well be attributed to the fact that the corporate plaintiff's store is the only supermarket open on Sunday in the area. Transcript p. 120. Further, the manager of the corporate plaintiff's store testified at hearing that Sunday business is not exclusively with Orthodox and Conservative Jews and that the store does not refuse to sell on Sunday to Gentiles. He said, "We don't discriminate. It would be bad business not to (sell to whoever came into the store)". It should also be added that examination of the day book of the corporate plaintiff, which was introduced in evidence, indicates that the corporate plaintiff's store, on Labor Day, did a volume of business which was greatly disproportionate to the business done on Mondays which were not holidays. This on a day after a Sunday on which they did their usual heavy business. The conclusion which I draw from this fact is that the store's Orthodox and Conservative customers either bought almost twice as much in this week as in other weeks or that the store was taking advantage of the fact that it was the only supermarket open on the holiday. The latter appeals more to reason than the former.[5]

It is stated in the majority opinion that "if the challenged law is constitutional the Crown Market can be open

---

5. The corporate plaintiff offered in evidence a record of its sales (Ex. 1). It is interesting to note that on Sunday, June 30, 1957, its gross sales were $3,-

only five days". This statement is correct when the distinction is added that the corporate plaintiff may not lawfully do business on Sunday, except during the hours established by the legislature, according to the secular law of the state, and that the corporate plaintiff may not do business lawfully between sundown on Friday and sundown on Saturday according to the law of Orthodox Judaism, which law is not part of the jurisprudence controlling this Court. The point I wish to make is that under the law with which we must concern ourselves, if the statute is constitutional, the corporate plaintiff is lawfully prohibited from doing business on only one day of the week.

If the bald statement quoted above is correct what is to prevent an unscrupulous business man from forming or joining a religious body which observes as its Sabbath the day of the week on which his business is slowest? If, in the view of the majority, he closes his place of business on his Sabbath, then he has the constitutionally protected right to open his business, whatever it may be and wherever it may be located, on Sunday and do business with any and all customers. I do not think that this argument need be further expanded in order to demonstrate the logical fallacy inherent in the position taken by the majority.

The majority accuse the Supreme Judicial Court of Massachusetts of intellectual dishonesty in writing the Has case when they say that the decision was an "ad hoc improvisation", yet the majority blissfully ignore the very real distinction between the Has case and Commonwealth v. White, supra. However, the majority choose to describe the language of the Has case quoted above as "characterization" rather than as "construction" so that they could bring it under the rule of Society for Savings in City of Cleveland Ohio v. Bowers, 349 U. S. 143, 151, 75 S.Ct. 607, 99 L.Ed. 950, rather than the line of cases represented by State of Minnesota ex rel. Pearson v. Probate Court, supra, United States v. Burnison, supra, and In re Murchison, supra, all of which hold that a construction as to the meaning of a state statute by the highest court of a state is binding upon the Federal Court.

The majority of the court in its opinion is highly critical of the exceptions in Section 6 of Chapter 136 of the General Laws of Massachusetts, to the blanket prohibition of Section 5 and refers to some of them either facetiously or as being the likely result of action by "pressure groups". I find nothing either in the record or in the law that warrants any such conclusions to be drawn. If there be anything in the legislative history of these exceptions which were enacted into law at various sessions of the Legislature and over a period of years that warrants such conclusions, it is unknown to me.[6] The granting of these exceptions by the Legislature ap-

583.61; on Wednesday, July 3, of the same year—$2,883.30, and on the following day, July 4, 1957,—$5,492.68. The religious convictions of some of the plaintiff's customers cannot explain this statistical data.

6. In the majority opinion it is stated that "the statute does not generically forbid the keeping open of a store on Sunday to sell food, but is just limits this liberty to selected types of stores. Employees of the favored stores are not less in need of rest than those of the Crown Market" etc. In a footnote relating to the subject matter the court has listed many of the exceptions which it charac-

terizes as "whimsical", "prolix" and "irrational". In my judgment there is no warrant or justification for the phrase "favored stores" or for the harsh adjectives employed. What the Legislature has done is to give recognition to the nature of the day as a day of rest, leisure and relaxation by permitting the sale of some foods and beverages which are believed to be necessary or to contribute to the refreshment of that day. No markets are permitted to be open at any hours on Sunday except markets for the sale of Kosher meat and milk which may remain open until 10:00 A.M. All other markets are closed including the super markets and large general stores. The clas-

pear to me to be matters of public policy peculiarly within the competence of the Massachusetts Legislature and well beyond the competence of this court. If I were to draw any conclusions from a study of these exceptions, I would say that they were undoubtedly granted for the purpose of accommodating the law to the needs of a developing society and that they were made for the purpose of contributing towards the refreshment of the people's participation in their day of rest. Some, perhaps, have been determined to be works of necessity under the present conditions of society. However that may be, they are legislative matters and matters of public policy affecting the people of Massachusetts and are not in any sense matters for this court to discuss and debate. In my view, it constitutes an unwarranted intrusion for a Federal Court to substitute its judgment on such matters for the judgment of the members of the Legislature who are elected by, and are directly responsible to the people of the Commonwealth of Massachusetts.

The history of the Lord's Day statute, which has been referred to as one of the "blue laws" of this Commonwealth by my colleagues, is one which dates back to the union of the states and is a part of the Golden Treasury of the kind of a civilization which every good citizen must try to perpetuate. It is not only a day of rest, but, quoting from the decision of Commonwealth v. McCarthy, 244 Mass. 484, at page 486, 138 N.E. 835, at page 836:

> " * * * that the day should not be merely a day of rest from labor, but also a day devoted to public and private worship and to religious meditation and response, undisturbed by secular cares or amusements. * * * Whatever inconvenience might result at the present day from the literal and general enforcement of the Lord's Day Act, and whatever hard cases may

sification established by the Legislature quite obviously refers solely to the types of stores and the products they sell, and in no way to the race or religion of the proprietor or the employees.

In the absence of a legislative history of each enactment creating the various exceptions that appear in Section 6 of Chapter 136 of the General Laws, the mere listing of the exceptions is wholly without meaning. Those relating to sports will be found to be much the same as the laws of other states regulating the conduct of amateur and professional sports on Sundays. The provisions of the law which permits the digging of clams on Sunday but not the dredging for oysters is characterized in a footnote to the majority opinion as being "whimsical". The fact is—and this is certainly common knowledge to the people of Massachusetts—that for generations, people residing along the seashore of the state have been digging clams for sport and for their own consumption when the tide is at a low ebb; whereas the dredging for oysters is a commercial enterprise involving the cultivation of oyster-beds, skillful dredging and other specialized activity. The distinction is not at all whimsical although it might appear to be so to the casual critic.

Further, the same footnote in the majority opinion states "News dealers whose stores are open every other day of the week (thus excluding Sabbath-observing Jews) may sell milk and tobacco at all times on Sunday". No such unreasonable interpretation has ever been placed on this section of the statute by any court. The statute obviously refers to regular newsdealers whose places of business are permitted by law to be open throughout the week and it certainly does not mean that if an individual newsdealer sees fit to close his doors on any particular day, he is thereby prohibited from opening on Sundays. Such an interpretation is lacking in logic and plain common sense. To suggest that Jewish newsdealers are prohibited from making the same sales on Sunday as their Christian competitors is not a correct statement.

The other exceptions in the statute could be similarly reconciled, but the foregoing will suffice to illustrate that the people of Massachusetts and their legislators have not busied themselves throughout the years with enacting laws that are whimsical, prolix or irrational. Least of all are the exceptions discriminatory.

have arisen under it, it is still the law of the land, to be judicially interpreted and administered according to its true intent and meaning, and upon the same rules as would govern us in the interpretation of any other statute."

The courts of the United States, the courts of the States, and those who help to frame our laws and who help to chart our way of life must make certain that the line is held within the law against *any person who* would make the law nothing more than an instrument for destroying religion in the name of democracy. I believe that this should be the credo of all people regardless of their religious beliefs.

It must never be forgotten that ours is a government of laws predicated upon majority rule, and it must be remembered that when this day was set the States of the Union had each reserved to itself the right to enact statutes within the boundary lines of its constitution for the comfort, safety, and convenience of its people and the spirit of rest, comfort, and quietness of a Sunday in the lives of the people of Massachusetts, with the importance of having in mind other economic factors, and with the recognition of the value of the obligations and responsibilities of parents and the happy relationship of members of families associated with this day which not only has the aspects of rest, recreation and association, but also spiritual reflection. We cannot become prisoners of a false philosophy, which is truly dialectical materialism,

and which in plain language represents the philosophy of Marx, Engel and Lenin, neither can we deny the right of others to disagree with our point of view. But is the person promoting this suit actuated by the spirit of the early founders of this great country, is he safeguarding the rights and privileges of our American society or is he using this as a medium by which to destroy these spiritual and economic values, the inevitable result of which might well be the complete destruction of our way of life? And if this were to happen, of what value would be our Constitution and laws, and our democratic way of life?

It is difficult to escape the conclusion that this is an example of an attempt to strike down the Constitution of Massachusetts and the Lord's Day as violative of rights under the First and Fourteenth Amendments of the United States Constitution on the basis of alleged religious belief, so that articles of every nature and description, kosher or non-kosher, could be sold. Examination of some of the documents attached to the appendix, which represent a part of the opinion filed in the Clerk's Office, clearly shows this.[7]

I am directing the Clerk of the Court to file as an appendix to the original copy of the opinion, which will be a matter of public record, copies of the following documents: Certified copies of Complaints against Harold Chernock doing business under the name and style of the "Crown Kosher Market, Inc.", the Defendant's Bill of Exceptions

7. Examination of the docket discloses that the appearance of the late Attorney General of the Commonwealth of Massachusetts was filed on July 23, 1958. While three amendments to the complaint which were filed during the summer of 1958 were assented to by attorneys for the Chief of Police of Springfield, they did not contain the name of the Attorney General although counsel for the plaintiff well knew notice had been given to the Attorney General under the statute. After the successor to the Attorney Gen-

eral had qualified the case was marked for hearing on October 30, several days before that the successor to the Attorney General requested a delay so that he might prepare and participate. At the hearing on November 3 the brief of the Commonwealth and a stipulation of fact were filed. The stipulation of fact does not agree with the evidence presented. No evidence was offered by the Attorney General's representative who was the only active counsel for the side adverse to the petitioner.

in the same case, which was filed on September 6, 1956, together with a brief filed by the Commonwealth of Massachusetts with the signature of the then District Attorney of the County of Hampden Stephen A. Moynahan; the brief of the defendant Chernock so called, doing business under the name and style of the "Crown Kosher Market, Inc.", and an exemplified copy of a Bill in Equity with the request for a temporary restraining order filed in the Superior Court of the County of Hampden, with the caption for the plaintiff "Crown Kosher Super Market of Mass., Inc., alias Harold Chernock d/b/a Crown Market", with the attorney for the petitioner in part the same as the one entered for the petitioner in the three-judge court case; and a copy of the Certificate of Incorporation of the Crown Kosher Super Market of Massachusetts attested to by the Secretary of the Commonwealth. It may be said parenthetically also that while there was an interlocutory decree for a temporary restraining order granted, this was obtained through no hearing but upon consent of counsel of record in this particular case.

The so-called cash book offered by the complainant's counsel, available for examination and marked as an exhibit, is a very small ledger book which contains figures running only from June, 1957, down to November, 1958. I am co-relating this with the footnote No. 5 on page 487 of 176 F.Supp. which discloses the fact that this store was open on every day in the year (with the exception of Saturdays, and other Jewish Holidays, and Thanksgiving Day) including Labor Day of 1957 and 1958, and that on all these days where business had been suspended by others, very substantial amounts running into four figures were taken in.[8]

These facts speak for themselves, but a fair inference from all these entries discloses the fact that the business of this Crown Kosher Market, Inc., alias Chernock, amounted to at least $600,000, and that about 40% of this business occurred on Sunday and on Mondays, particularly when a holiday was celebrated on Monday. They show figures of a very substantial nature on the 4th of July of 1957 and 1958. This is evidence of the commercial point of view in contradistinction to the spiritual and patriotic background, of a day dedicated to the courage and Americanism of our Founding Fathers, when there was truly a great heritage passed down to the people of the United States by a proclamation on that same day that a new nation was born in keeping with the written Declaration of Independence; and the Crown Kosher Meat Market so-called remained open.

In closing I feel constrained to say that the law sought to be invalidated here has been on the statute books of the Commonwealth of Massachusetts in substantially its present form since Massachusetts joined the Union. Until very recently there was scarcely a voice raised against what has become a traditional part of our way of life. Those who framed the Constitution of Massachusetts, and indeed those who framed the Constitution of the United States, saw nothing incompatible in the observation of the Lord's Day as a day of rest, and there is nothing in the Constitution of either the United States or Massachusetts that admits of any such strained interpretation as is sought here to the First and Fourteenth Amendments. The opinion of the majority of the court, if allowed to stand, will advance the cause of religious freedom and liberty not one iota. Its inevitable effect will be to disunite and

8. July 4, 1957, $5,492.68; September 1, Sunday, $4,179.58; September 2, Labor Day, $2,536.45; Christmas Day, $1,885.-86; January 1, 1958, Wednesday, $2,233.-66; July 4, 1958, $5,816.98; August 31, Sunday, $3,670.05; Monday, Labor Day, $2,173.52.

divide the people of this Commonwealth, to dislocate our economic set-up, and to lay the foundation for the growth and development of cancer "isms", having in mind the economic values that are co-related with other statutes of the Commonwealth regulating hours of work and hours of labor and the rights and privileges of owners of many places of business engaged in many specialties, who do not seek to carry on their business activities on the Lord's Day. The law should be upheld.

I feel that I have discussed this matter sufficiently in the opinion, but I am disposed to re-emphasize the fact that ours is a government by the majority and that this majority should not be unreasonably unfair with the rights of the minorities who sincerely observe their religious beliefs. The good Jewish people, particularly those who are Orthodox Jews, faithfully observe Saturday as their Sabbath, which serves as a day of comfort and rest for them, and they representing the working class, as well as the Christians, because of the forty hour week law enjoy this Saturday and abstain from work the same day.

They are permitted under the present Lord's Day statute to purchase kosher meats on Sunday. In all other respects the food they partake of outside of special holy days in the liturgy of Orthodoxy is the same as that used by Christians, but we cannot forget that if there is any interference with their religious observances these questions should be settled by the General Court of Massachusetts, which is in a position to recognize these minority rights which after all are but a small percentage of the population. In this particular matter before the Court these petitioners have been engaged in business since 1954, and an examination of their charter rights clearly indicates that they have the power to open warehouses on Sunday. It is clear that the Jewish people who passed down through the corridors of centuries the precious spiritual values which have served as a foundation stone of respect for God would not for one minute support any movement where under the cloak of religion a one-man corporation was using a spiritual garment as a medium by which unjustly to enrich himself.

I would dismiss the complaint, or refuse the injunction, and declare the statute constitutional in the circumstances.

I am respectfully reserving the right to file an additional memorandum if I find it necessary to discuss other matters which are a part of the history of this case.

On Petition for Rehearing

PER CURIAM.

We have before us a paper wherein the Attorney General for the Commonwealth of Massachusetts comes "and moves that a new trial be granted in the above entitled matter". This may seem somewhat curious because, although an appearance was filed on behalf of the Governor and the Attorney General, the Attorney General has not appeared for the sole defendant, nor does he purport to act for him. We must assume, however, that in effect the Commonwealth intervened as a party defendant pursuant to its undoubted right to do so under 28 U.S.C. § 2284(2), and that the failure to file a formal petition for intervention was just an administrative omission. Thus we take it in the present movant's favor that he has standing to seek a new trial.

Ground 1 of the motion for a new trial is that: "The evidence submitted is insufficient as a matter of law to sustain findings of fact." Ground 2 reads: "The findings of fact made by the Court are inconsistent with such evidence as was submitted." These grounds are of course important if true. But it must be remembered that in an equity case the court is the trier of the facts. It is the

court which must weigh the testimony and other evidence, observe the demeanor of the witnesses, and find the facts. It is abundantly clear that there is evidence to support the findings of fact, and the majority of the court are content to abide by those findings on the evidence submitted.

Ground No. 3 complains of the court's finding that most of the facts were stipulated by the parties, whereas the stipulation actually was limited to the tenets of the Orthodox Jewish faith and did not relate to particular facts affecting the petitioners. This asserted ground for a new trial is patently absurd, in the face of an examination of the stipulations of fact signed by the movant's attorney, especially the supplementary stipulation.

Ground No. 7, in which it is stated that the "evidence clearly shows that the meat was not washed on Sunday", is based upon a clear misstatement of the court's finding that "The inspector comes * * on Sunday for the washing of *any* meat from animals slaughtered on the previous Thursday *which is on hand.*" [Italics added.] In any event, this is a tempest in a teapot concerning a very minor matter.

The findings attacked by grounds numbered 4, 5, 6 and 8 are supported by substantial credible testimony, by the stipulations of fact, and by the exhibits, just as is the finding that 95 per cent of Crown Market's stock is kosher.

Ground No. 9 objects to the statement in the court's opinion that the plaintiff customers and plaintiff rabbis cannot, by any act of shopping at the corporate plaintiff's store or by inspecting it, violate the Sunday law. It was stipulated that the plaintiff customers were Orthodox Jews; the rabbis, needless to say, are orthodox. These persons are squarely exempted from the Sunday law by c. 136, § 6, even as construed in Commonwealth v. Starr, 1887, 144 Mass. 359, 11 N.E. 533.

Ground No. 10 objects that the judgment is invalid because the majority opinion interpreted the Massachusetts Sunday law in a manner contrary to the interpretation placed upon it by the state courts. The court was bound to accept as its premise the interpretations put upon the Sunday law by the Supreme Judicial Court, and it did so. In fact, at the oral argument before us we understood movant to contend that all the plaintiffs were within the exception contained in § 6; but the court was obliged to accept the contrary holding of the Starr case, supra. The majority did reject, which it had the right to do, the characterization of the statute in Commonwealth v. Has, 1877, 122 Mass. 40 as being merely a police measure designed to preserve a day of rest. We rejected that characterization as sporadic in the state decisions and unsound on the face of the statute. It is also to be noted that the Supreme Judicial Court has never had occasion to pass on the federal constitutional questions presented in this case.

Ground No. 11 objects that there is some inconsistency between the court's decree, which holds the statute unconstitutional merely as applied to the petitioners in this case, and the court's opinion, which states that the statute violates the Federal Constitution because it was a statute respecting an establishment of religion. This objection is based upon a tortured reading of one phrase of the opinion torn out of context. It is apparent that the only question argued or considered was the alleged unconstitutionality of the statute as applied to these complaining persons.

It seems hardly necessary to answer the objection contained in ground 12 of the motion that the decree entered by this court "has the effect of preferring members of the orthodox Jewish faith to members of any other religious sect." This *objection ignores, among other things,* the fact that the court held that these plaintiffs were unconstitutionally discriminated against. We can only knock out that which we find to be unconstitutionally discriminatory; we cannot go

further and legislate a wholly even balance between the competing interests.

 Ground No. 14 objects that the decree purports "to restrain only a local police chief and does not extend to a State official", whereas under 28 U.S.C. § 2281 the power of a three-judge court is limited to restraining the action "of any officer of such State in the enforcement or execution of such statute". This objection is insubstantial in view of the answer and stipulation, both of which conceded that the defendant police chief did and would enforce the state law. Browder v. Gayle, D.C.M.D.Ala.1956, 142 F. Supp. 707, affirmed 1956, 352 U.S. 903, 77 S.Ct. 145, 1 L.Ed.2d 114. Besides, this question is probably rendered moot by the Attorney General's intervention as a party defendant.

Grounds 13 and 15 may be discussed together. In ground 13 it is objected that "Additional evidence is available as indicated in the minority opinion to establish that the corporate plaintiff in the present proceeding was actually a party in State proceedings and therefore is estopped to obtain the relief requested in the present proceeding." More generally, in ground 15 "the Attorney General seeks a new trial for purposes of clarifying and elucidating further the conflicting factual situation described in the minority opinion."

The State's titling of an indictment brought against "Harold Chernock d/b/a Crown Market" cannot be laid at the door either of Chernock or of the corporation. Further, the plaintiff Crown Market is certainly a corporation, whereas, as the answer admits, the state prosecution and conviction were solely of the individual Chernock. See also Browder v. Gayle, supra. The auxiliary civil action in the state courts never reached the merits before its dismissal as moot. Moreover, grounds 13 and 15 are both insufficient in failing to indicate what clarifying evidence could be introduced at a new trial, unless the only evidence is that described in the dissenting opinion. Assuming that it is so, the movant has wholly failed to demonstrate either that the failure to introduce such evidence was excusable or, more important, that any new evidence is available which would affect the result.

 It may be that the case might have been presented to us differently if another had been in charge of defending it. But we must act on the evidence presented to us in an adversary proceeding, not on matters dehors the record found in an ex parte investigation. Webster Eisenlohr, Inc. v. Kalodner, 3 Cir., 1944, 145 F.2d 316, certiorari denied 1945, 325 U.S. 867, 65 S.Ct. 1404, 89 L.Ed. 1986.

An order will be entered denying the motion for a new trial.

McCARTHY, District Judge, dissents from the denial of the motion for a new trial, and reserves the right to file a memorandum at a later date.