COMMONWEALTH *vs.* EDWIN M. WHITE.

Plymouth. November 20, 1905. — March 2, 1906.

Present: KNOWLTON, C. J., MORTON, HAMMOND, LORING, & SHELDON, JJ.

*Lord's Day. Cranberries.*

Gathering cranberries on the Lord's day when there is an unusually large crop but no sudden and unexpected emergency is not a work of necessity within the meaning of St. 1904, c. 460, § 2.

COMPLAINT under St. 1904, c. 460, § 2, received and sworn to in the Third District Court of Plymouth on September 20, 1904, charging that the defendant at Carver on September 18, 1904, that being the Lord's day, did labor, business and work, to wit, the gathering of cranberries, the same not being a work of necessity or charity.

The case came by appeal to the Superior Court where it was tried before *Lawton,* J.

There was evidence tending to show that the defendant on the day named in the complaint and for some time before was a part owner and the superintendent and sole manager of seventeen cranberry bogs in the town of Carver, upon which four gangs of

pickers were at work on the Sunday in question; that on that day, which was pleasant, he was seen by the complainant, a constable, at a short distance from the bogs driving toward them; that his attention was called to the fact that pickers were at work on the bogs, and he thereupon asserted his intention to continue to do this work on Sunday, saying that he had about ten or fifteen thousand barrels, and would spend it all in fighting rather than quit working Sundays; that later on the same day he was seen on the premises somewhere between the screen house and the bogs while the pickers were at work; and there was evidence tending to show that on that day the work was carried on under his superintendence.

He testified that he had, on the Sunday in question, from three hundred and fifty to four hundred pickers at work; that he could not harvest the crop without working on Sunday; that he had been in the habit of gathering on Sundays; and that he had picked cranberries every Sunday since he had been in the business. He admitted that he had said to the complainant that he could not afford to stop working on Sunday and that he should keep on. He also said, on cross-examination, that the only reason he picked on Sunday was to save his crop; that if he had employed men enough, one sixth more, he could have done the same work in six days that he was doing in seven; that the crop this year was the largest they ever had, almost three times greater than that of any previous year; that he knew the last of July or the first of August that they were going to have such a crop, and that he should have to employ a great many more men to take care of it; that he could not accommodate any more men; that they lived in shanties owned by him; that the shanties cost money; that he did not try to put up tents; that he began to employ three hundred or four hundred men about September 15 and kept them from that time on.

At the close of the evidence the defendant among other requests asked the judge to rule, that gathering cranberries on the Lord's day is not necessarily unlawful; that the question depends upon the existence of a reasonable necessity, and it is only when the work is clearly unnecessary that the statute is violated; that if, owing to the size of the crop, the difficulty of procuring or housing labor, the prospect of frost or the danger of the fruit

getting overripe, and other circumstances, the defendant believed, and had reason to believe, that the crop might be injured or lost if he did not gather it on the Lord's day, he was justified in so doing.

The judge refused to give these and other instructions requested by the defendant. He instructed the jury, in substance, that the work alleged to have been done was not, under the circumstances, work of necessity within the meaning of the statute, and submitted the case to them upon the issue of fact whether the defendant gathered cranberries upon the day named in the complaint. The jury returned a verdict of guilty; and the defendant alleged exceptions.

*S. H. Tyng,* (*H. T. Lane* with him,) for the defendant.

*Asa P. French,* District Attorney, for the Commonwealth.

HAMMOND, J. The main question is whether the evidence would warrant a finding that the work in question was one of " necessity " within the meaning of that word as used in the statute, (St. 1904, c. 460, § 2,) which, with certain exceptions not here material, makes it a criminal offence to do on the Lord's day " any manner of labor, business or work, except works of necessity and charity."

In construing this statute it is to be borne in mind that so far as material to the question before us, it is simply the continuation of a law which from a very early time in the history of the Colony has been constantly upon our statute books. It is one of a series of statutory provisions enacted to secure the proper observance of the Lord's day, as understood by our forefathers. Their idea of the Lord's day, the manner in which it should be spent, and the object of the system of statutes passed from time to time to secure its proper observance are set forth in the various preambles to those statutes. One of these is in the following language : " Whereas it is the duty of all persons, upon the Lord's Day, carefully to apply themselves, publickly and privately, to religion and piety, the prophanation of the Lord's Day is highly offensive to Almighty God, of evil example, and tends to the grief and disturbance of all pious and religiously disposed persons; therefore," etc. See Prov. St. 1760–61, c. 20, § 1; 4 Prov. Laws, (State ed.) 415. Perhaps the most instructive preamble is that which precedes St. 1791, c. 58, which was the first

general statute passed on this subject after the adoption of
our State Constitution.  It reads as follows: " Whereas the ob-
servance of the Lord's Day is highly promotive of the welfare of
a community, by affording necessary seasons for relaxation from
labor and the cares of business; for moral reflections and conver-
sation on the duties of life, and the frequent errors of human
conduct; for public and private worship of the Maker, Governor
and Judge of the world; and for those acts of charity which
support and adorn a Christian society: And whereas some
thoughtless and irreligious persons, inattentive to the duties and
benefits of the Lord's Day, profane the same, by unnecessarily
pursuing their worldly business and recreations on that day, to
their own great damage, as members of a Christian society; to
the great disturbance of well disposed persons, and to the great
damage of the community, by producing dissipation of manners
and immoralities of life: Be it therefore enacted," etc.  Such
was the idea of the Lord's day for the observance of which this
system was devised.

It is argued by the defendant that the times have changed and
with them have also changed ideas, manners and customs, and
that what was formerly regarded as unnecessary may now be
regarded as necessary.  To a certain extent this may be true.
In so far as changes in physical matters affect the question of
necessity, they may be properly considered.  But changes in the
view of people as to the nature of the Lord's day, or as to the
manner in which it should be spent, whether such changes are
for the better or for the worse, are not to be considered.  So far
as respects such changes alone the word " necessity " has the same
meaning as when first inserted in this system of statutes.  It
was originally inserted to secure the observance of the Lord's
day in accordance with the views of our ancestors, and it ever
since has stood and still stands for the same purpose.  In inter-
preting it, the precepts set forth in the preambles above quoted
must still be borne in mind.  As said by Ames, J. in *Davis*
v. *Somerville*, 128 Mass. 594, 596, in speaking of a similar
statute: " Our Puritan ancestors intended that the day should
be not merely a day of rest from labor, but also a day devoted
to public and private worship and to religious meditation and
repose, undisturbed by secular cares or amusements.  They saw

fit to enforce the observance of the day by penal legislation, and the statute regulations which they devised for that purpose have continued in force, without any substantial modification, to the present time [1880]. Whatever inconveniences might result at the present day from the literal and general enforcement of the Lord's day act, and whatever hard cases may have arisen under it, it is still the law of the land, to be judicially interpreted and administered according to its true intent and meaning, and upon the same rules as would govern us in the interpretation of any other statute." If any changes are to be made they should be made by the Legislature.

In this spirit must this statute be interpreted, and in the light of this method of interpretation it is clear that the defendant has not shown that his work was one of necessity. Without going over the evidence in detail, it is sufficient to say that here there was no extraordinary, sudden and unexpected emergency. The crop was large, it is true, but that it was likely to be large had been known for weeks. The weather was only what might have been expected. The substance of the testimony was simply that in gathering the crop it was somewhat less expensive and more convenient to work seven days in the week rather than six. That is not enough. Such testimony falls far short of showing " necessity " within the meaning of the statute. The case must be classed with *Commonwealth* v. *Sampson*, 97 Mass. 407 ; *Commonwealth* v. *Josselyn*, 97 Mass. 411 ; *McGrath* v. *Merwin*, 112 Mass. 467, and similar cases.

The question whether the defendant was engaged in the work was left to the jury under proper instructions. We see no error in the manner in which the court dealt with the defendant's requests for instructions. In view of the nature of the exception to the exclusion of the evidence as to the advice of counsel, we understand it to be waived.*

*Exceptions overruled.*

---

* The defendant offered to show that the work in question was carried on under the advice of counsel. The judge excluded the evidence, and the defendant excepted. " This evidence was offered solely to meet the contention that the defendant wilfully defied the law."