Bolster, C. J.:
The plaintiff in this case, which was submitted on agreed facts, told the defendant on or about Sept. 10, 1929, to order for her 25 shares of “Standard Brands, Inc., at the market.” That stock was not then listed on any Massachusetts stock exchange, and was not “qualified” according to Gen. Laws, Ch. 110A, until 1932. It was listed on the New York Stock Exchange. Whether the defendant was or was not registered as a broker does not appear. It caused the plaintiff’s order to be filled in New York, advancing the purchase money, received a “street certificate”, and advised the plaintiff that it had made the purchase for her account. The plaintiff made partial payments until May 10,1930, when she gave the defendant a collateral note for the unpaid balance of the purchase price. Thereupon the stock was transferred to the plaintiff’s name, a stock transfer power given by her to the defendant, and the certificate lodged with the defendant, in whose possession it still is. In November, 1934, the plaintiff made a tender to the defendant, claiming a right to rescind the transaction, and upon refusal sued for the money paid by her to the defendant. The defendant counters with a declaration in-set-off upon the note and for money lent. The plaintiff claims *40 that the defendant made a “sale” of the stock to her, which sale was illegal because in violation of the Sales of Securities Act.
We do not find it necessary to determine whether in this case, apart from the construction to be given that act, the defendant’s relation to its customer was that of vendor or pledgee, cf. Wood v. Hayes, 15 Gray 375. Brown v. Rushton, 223 Mass. 80. Denton v. Gurnett & Co., 69 Fed. 2nd 750. Weston v. Jordan, 168 Mass. 401. Furber v. Dane, 203 Mass. 108. Palley v. Worcester Co. Nat. Bk., 1935 A. S. 1155.
Even if we assume in the plaintiff’s favor that for some purposes the defendant might be held to have made a sale of this stock to her, it does not follow that the defendant made a “sale” to the plaintiff taithin the meaning of G. L., Ch. lloA. That was the question upon which the trial judge ruled. The original statute was Stat. 1921, Ch. 499. If at that time the word “sell”, in such connection, had acquired by judicial exposition, a fixed and certain meaning which gave the margin broker the status of a vendor to his customer, it might be said, according to established canons of statutory interpretation, that the legislature meant it to have that meaning here. Such canons are helpers, not masters, and the same legislature can hardly be presumed ignorant of the many opinions in which the margin broker is spoken of as an agent to buy, nor of the fact that in at least one case, Rice v. Winslow, 180 Mass. 500, the word “sell” in a statute was “used in a popular sense” as stated in another case simultaneously decided. Chase v. Boston, 180 Mass. 458. Neither can we put to much use another canon of statutory interpretation, — that a statute adopted from another jurisdiction carries the meaning judicially given it in the state of its nativity. The statutes referred to in the report of the commission of 1920 (House 1175 of 1921) *41 which are both American and English, are so variant that no certain meaning can be, by that test, attached to this crucial word “sell”. Any decisions in-other jurisdiction as to the meaning of that word would have to be read in the light of the fact that Massachusetts is in rather a solitary position in holding the margin broker to be a vendor. Chase v. Boston, supra at p. 460. The instant statute, following as it does the draft submitted by the commission so far as concerns the construction of this crucial word, appears to present a localized question. It follows that the meaning intended must be determined mainly by the statute wording, read in the light of conditions which led to its passage and the results sought to be attained by it, remembering always that, as Judge Holmes put it, “a word is but the skin of a thought”.
It may clear the atmosphere to state that the question is not whether the margin broker has title to the stock, but whether he is a seller of the stock to his customer. A trustee has title, but when he conveys to his cestui he does not sell to him. Neither does it solve the problem to say that the relations of the broker and his customer are contractual. The relation of agency may rest on contract. But the question here is whether those relations are of a sort which the legislature then meant to prohibit unless certain conditions were fulfilled. We cannot invoke in interpretation the lessons to be drawn from the speculative orgy which culminated in 1929, or any of the modern remedial ideas born of that experience, cf. Com. v. White, 190 Mass. 578. The dominant purpose of the act of 1921 was to control the promotion and sale to the public of fictitious securities,— to stop fraud. The report of the commission, which may fairly be deemed expressive of public opinion of that time, says things about the benefits of honest speculation which might today be put in more guarded language. The means *42 adopted for securing the results desired were twofold, compulsory registration of those who had been putting out or might put out fraudulent securities, and a registration of the securities themselves, before circulation, with a public body having veto power. Both measures have criminal sanctions. Whether the legislature went too far in exempting only stocks listed on Massachusetts exchanges is a question which does not concern us, and we are clear that departmental tolerance, as evidenced by the letter of Mr. Highlands in the record, is not the equivalent of the affirmative action which the Department of Public Utilities is authorized to take under Gen. Laws, Ch. 110A, see. 3(e). The stock which the plaintiff ordered bought was not exempt and it had not been qualified for sale.
The control over the broker is through registration, and that whether he sells exempt or unexempt securities. The definition of a “broker” in section two is primarily for •registration requirement. The inclusion of one who buys for another, to resell, brings such a broker into the class of those who must register, but is not in our opinion determinative of the question whether this defendant made a sale to the plaintiff. One cannot be too literal-minded in the task of statutory interpretation, lest the letter kill the spirit. Questions of meaning are not settled by mechanical collocation of legal concepts, like a picture puzzle. When the plaintiff offers us this formula for decision, — that the margin broker has title, and sells to his customer, and therefore he sells within the meaning of.the act, and when upon examination it appears that under that formula a broker who buys on margin, sharing the risk with his customer, violates the act, while a broker who persuades his customer, one of the protected class, to prepay in full does not violate the act, it would seem that there is something about the .formula which does not work out with the central purpose *43 of the act. A surer test would seem to he whether he is an emitting agent, or a receiving agent for one against whom the act is not directed, according to the decision in Kneeland v. Emerton, 280 Mass. 371. The sanctions of the act could not be effectively applied to the ultimate promoter of fraudulent securities, usually a non-resident, so that burden is laid on the broker as his agent, not on every one who merely happens to be a broker. The defendant in Kneeland v. Emerton was a broker within the prohibition against sales, one who, to borrow a phrase frequently applied to the innkeeper, “utters” the securities. In our opinion the present defendant was not such a broker.
This conclusion renders it unnecessary to consider what effect, if illegality were found, should be given to the fact that the stock was put in the plaintiff’s name, or the fact that she paid for it by her note. Nor need we consider the constitutional question raised in the brief of counsel for the Boston Association of Stock Exchange Firms, further than to suggest that any interstate character would seem to have departed from this stock by the timé it reached the defendant. The case here stated does not say that the plaintiff told the defendant to buy the stock in New York, or that it could not have been bought “over the counter” in Boston.
We infer that the interests of the parties will be served by putting the case in form for immediate appeal or immediate judgment. Therefore judgment is to be entered for the defendant in the original case and judgment for the defendant,, as plaintiff in-set-off, upon the declaration in-set-off, with interest from the date of the writ.
So ordered.