Gants, Ralph D., J.
The plaintiff Kevin Bujold (“Bujold”) was terminated from his employment with the defendant EMC Corporation (“EMC”) after he refused to work eight consecutive days without a day off. Bujold contends that EMC violated G.L.c. 149, §48 by compelling him to work more than six consecutive days without a day off, and violated G.L.c. 149, §148A by firing him for refusing to do so.[1] EMC now moves for summary judgment, arguing that Bujold is not among those employees who are protected under G.L.c. 149, §48. After hearing, for the reasons stated below, EMC’s motion for summary judgment is DENIED.
DISCUSSION
Bujold was employed by EMC as a Technical Support Engineer, working at an office on the second floor of an EMC facility at 171 South Street in Hopkinton, known as “HOP II.” In October 2005, he was directed by his supervisor to work a schedule in which he would work eight consecutive ten-hour days, preceded by *348 three consecutive days off and followed by five consecutive days off. He refused to work the required schedule and, as a result, was terminated on November 11, 2005.
G.L.c. 149, §48 provides in pertinent part:
Every employer of labor engaged in cariying on any manufacturing, mechanical or mercantile establishment or workshop in the commonwealth shall allow every person, except those specified in section fifty, . . . employed in such manufacturing, mechanical or mercantile establishment or workshop at least twenty-four consecutive hours of rest, which shall include an unbroken period comprising the hours between eight o’clock in the morning and five o’clock in the evening, in every seven consecutive days . . . Whoever violates this section shall be punished by a fine of three hundred dollars.
G.L.c. 149, §48. There is no dispute that Bujold had been directed by EMC to work eight consecutive days without “at least twenty-four consecutive hours of rest ... in every seven consecutive days.” Rather, the dispute in this litigation rests on whether Bujold, while employed by EMC in the fall of 2005, was employed in a “manufacturing, mechanical or mercantile establishment or workshop,” as those terms are defined under G.L.c. 149.
A “manufacturing establishment,” “mechanical establishment,” and “mercantile establishment” are each defined terms under Chapter 149. See G.L.c. 149, §1. A “manufacturing establishment” is defined as “any premises, room or place used for the purpose of making, altering, repairing, ornamenting, finishing or adapting for sale any article or part thereof.” Id. A “mechanical establishment” is defined as “any premises, other than a factory as above defined, where machinery is employed in connection with any work or process carried on therein.”[2] Id. A “mercantile establishment” is defined as “any premises used for the purpose of trade in the purchase or sale of any goods or merchandise ...” Id. Bujold does not contend that he was employed in a “manufacturing establishment,” as that term is defined under G.L.c. 149, §1. Rather, he contends that the “premises” in which he was employed at EMC was both a “mechanical establishment” and a “mercantile establishment” as defined under G.L.c. 149, §1. EMC contends that these terms should be defined far more narrowly and, when so defined, that there is no material dispute that the “premises” in which Bujold worked was neither a “mechanical establishment” nor a “mercantile establishment.”
“The general and familiar rule is that a statute must be interpreted according to the intent of the Legislature ascertained from all the words construed by the ordinary and approved usage of the language, considered in connection with the cause of its enactment, the mischief or imperfection to be remedied and the main object to be accomplished, to the end that the purpose of its framers may be effectuated.” Lane v. Plymouth Restaurant Group, 440 Mass. 469, 472 (2003), quoting Hanlon v. Rollins, 286 Mass. 444, 447 (1934). See also Commonwealth v. Hinds, 437 Mass. 54, 63 (2002). To understand the cause of the enactment of G.L.c. 149, §48 in 1913 (and its amendment in 1939), and the “mischief’ to be remedied, one must look carefully at the historical context in which G.L.c. 149, §48 was enacted and amended. To do this, one must begin at the colonial era and survey the rich history of legislative enactments (and the judicial interpretation of those laws) regarding a mandatory day of rest.
The History of “Weekly Day of Rest” Legislation Through the Enactment and Amendment of G.L.c. 149, §48
A weekly day of rest has been mandated by law in Massachusetts since the early days of the Massachusetts Bay Colony. In 1629, a letter of instruction from the Governor and Depuly of the Company of the Massachusetts Bay Colony issued a letter of instruction that required everyone to stop their labors on Saturday at 3 o’clock in the afternoon so that they could spend the rest of that day preparing for the next day’s Sabbath. Report of the Joint Special Committee to Revise, Consolidate and Arrange the General Laws of the Commonwealth Relating to the Observance of the Lord’s Day, 1907 House Doc. No. 1160, Appendix at 72-73 (“1907 Joint Special Committee Report”). In 1650, the Plymouth Colony enacted a law providing that “whosoever shall profane the Lord’s Day by doing any servile work or any such like abuses shall forfeit for every such default ten shillings or be whipped.” Id. at 72.
Shortly after Plymouth Colony was united with the Massachusetts Bay Colony in 1691, id. at 72, the Massachusetts colonial legislature directed its justices of the peace “to restrain all persons from ‘keeping open their shops, or following their secular occasions or recreations in the evening preceding the Lord’s day, or on any part of the said day or evening.” Prov. St. of 1692-3 (5 W.&M.) c. 22, §6, 1 Prov. Laws (State ed.) 59, quoted in Commonwealth v. Dextra, 143 Mass. 28, 29 (1886). This act made no exception for works of necessity or charity. Id.
In 1760, the Massachusetts colonial legislature repealed the various Sunday laws and enacted a new one, finding that “by reason of different constructions of the several laws now in force relating to the observation of the Lord’s Day, the said laws have not been duly executed, and notwithstanding the pious intention of the legislators the Lord’s Day hath been greatly and frequently profaned.” 1907 Joint Special Committee Report at 74. The new act, among other restrictions , provided, “That no person whatsoever shall keep open their shops, warehouses, or workhouses, nor shall, upon the land or water, do, or exercise, any labor, business, or work, of their ordinary calling, nor any sport, game, play, or recreation, on the Lord’s day, *349 or any part thereof (works of necessity and charity only excepted) . . .” Prov. St. Of 1760-1 (1 Geo. III.) c. 20, §2, 4 Prov. Laws (State ed.) 415, quoted in Commonwealth v. Dextra, 143 Mass. at 29.
In 1791, the Massachusetts Legislature repealed all the old Sunday laws and enacted a new Sunday code, the first to be enacted since the adoption of the Massachusetts Constitution, but did not change the substantive provisions of the 1760 colonial law preserving Sunday as a day of rest and prayer. The preamble to this new law reveals its legislative purpose and spirit:
Whereas the observance of the Lord’s day is highly promotive of the welfare of a Community, by affording necessary seasons for relaxation from labour & the cares of business; for moral reflections & conversation on the duties of life, & the frequent errors of human conduct; for public and private worship of the Maker, Governor & Judge of the World and for those acts of charity which support and adorn a Christian Society; ... to the great disturbance of well disposed persons, & to the great damage of the community, by producing dissipation of manners & immoralities of life . . .
Acts, 1791, Ch. 58. The 1791 statute, like the 1760 colonial law, provided “that no person or persons whatsoever shall keep open his, her or their shop, ware-house, or work house, nor shall upon land or water do any manner of labour, business or work (works of necessity & charity only excepted) ... on the Lord’s day, or any part thereof upon penalty of a sum not exceeding twenty shillings, nor less than ten shillings for every offence.” Id. Apart from various exemptions being made to the prohibition of work on Sunday, this 1791 statute remained the law of Massachusetts when the Joint Special Committee Report studying the Sunday laws was issued in February 1907. The Joint Special Committee Report stated:
The first section of the act of 1791 is the most important, as it is the foundation of the existing law, and indeed is now in existence, many exemptions having been made, by reason of changed conditions ... These exemptions have been included from time to time, and are practically all provisions that relate to the carrying on of different kinds of business of a nature unknown in 1791. The steamboat and the steam engine, the telephone, the telegraph, the use of gas and electricity, all came into existence in comparatively recent years. They speedily became necessities, and laws had to be made concerning their use on Sunday. These provisions, together with the liberal Sunday legislation regarding the sale of drugs and medicines, newspapers, etc., constitute practically the only amendments of any moment made during the last hundred years.
1907Joint Special Committee Report at 75-76. See also Commonwealth v. Dextra, 143 Mass. at 30 (“In the Rev. Sts. c. 50, §1, the Gen. Sts. c. 84, §1, and the Pub. Sts. c. 98, §2, the prohibition [in the 1791 statute] was enacted in substantially the same language and manner”); Davis v. Somerville, 128 Mass. 594, 596 (1880) (“Our Puritan ancestors intended that [Sunday] should be not merely a day of rest from labor, but also a day devoted to public and private worship and to religious meditation and repose, undisturbed by secular cares or amusements. They saw fit to enforce the observance of the day by penal legislation, and the statute regulations which they devised for that purpose have continued in force, without any substantial modification, to the present time.”).
In 1877, the Supreme Judicial Court observed that what had then become codified as G.L.c. 84, §§1,2 included as two distinct offenses: “ 1. Keeping open a shop, warehouse or workhouse. 2. Doing any manner of labor, business or work, except works of necessity or charity.” Commonwealth v. Has, 122 Mass. 40, 40 (1877). The Sunday statute also provided that a person will not be subject to the penalties set forth in the statute if “he disturbs no other person” in “performing secular business, travel or labor on the Lord’s day.” Id. at 41, quoting G.L.c. 84, §9. When Has, the defendant shop owner, stayed open on Sunday and claimed as his defense that he disturbed no one by doing so, the Court rejected his defense, distinguishing between keeping open a shop, which it found to be prohibited on Sunday without exception, and engaging in secular business, which it found to contain an exception for works of necessity or charity, and when it disturbed no one. Id. at 41-42. Similarly, in 1886, the Supreme Judicial Court held that it need not decide whether it was a work of necessity for a barber shop to cut hair and shave beards on Sunday because the exception for works of necessity did not extend “to the keeping open of shops, warehouses, and workhouses for the purpose of transacting business on the Lord’s day.” Commonwealth v. Dextra, 143 Mass. at 30-32. The Court declared, “We construe the statute to mean that the law prohibits the keeping open a shop, warehouse, or workhouse for the purpose of doing business therein on the Lord’s day; and that it is immaterial what that business may be.” Id. at 32.
It is interesting that, when the Sunday statute was amended in 1904, it was not to relax the restrictions on keeping shops, warehouses, and workhouses open on Sunday in view of the Supreme Judicial Court opinions in Has and Dextra, but to tighten the restriction on sports and entertainment following a Supreme Judicial Court decision that was understood, at least by the Governor of Massachusetts, to have permitted every type of entertainment on Sunday. See 1907Joint Special Committee Report, “Minority Report on Sunday Amusements,” at 19-20, quoting Governor John L. Bates’s special message to the Legislature of 1904. Thus, G.L.c. 98, §2 was amended to read in pertinent part:
*350 Whoever, on the Lord’s day, keeps open his shop, warehouse or workhouse, or does any manner of labor, business or work, excepts works of necessity and charity, or takes part in any sport, game, play or public diversion, except a concert of sacred music or an entertainment given in good faith by a religious or charitable society in aid of a religious or charitable purpose, the entire proceeds of which, if any, less only the necessary and reasonable expenses, not to exceed twenty-five percent of such proceeds, are to be devoted exclusively to a religious or charitable purpose, shall be punished by a fine
Acts, 1904, c. 460, §2. “It was plainly the intent of the Legislature by the enactment of this provision to put a stop to performances on Sunday similar to that of which complaint had been made, and to allow only such as might be given by a religious or charitable society.” 1907 Joint Special Committee Report, “Minority Report on Sunday Amusements,” at 20.
In March 1906, the Supreme Judicial Court in Commonwealth v. White considered an appeal of the conviction of the part owner, superintendent, and sole manager of seventeen cranberry bogs in Carver who had directed his 350-400 pickers to work on Sunday to harvest cranberries, contending that the picking of cranberries on Sunday was necessary to save his crop. 190 Mass. 578, 579 (1906). The Court upheld the finding that this labor was not a work of necessity under the revised G.L.c. 98, §2, noting that “necessity” must be interpreted in light of the long legal tradition of preserving Sunday as a day of rest from labor and required a showing beyond inconvenience and increased labor costs. 190 Mass. at 582. The Courtnoted that the defendant knew by late July that his cranberry crop was to be his largest ever, that he could have harvested the crop working six days per week by hiring more pickers, and that he could have housed these additional hired workers in tents. Id. at 579.
Consequently, when the Joint Special Committee of the Massachusetts Legislature was appointed in July 1906 “to revise, consolidate and arrange the General Laws of the Commonwealth relating to the observance of the Lord’s Day,” the legal tradition of a day of rest on Sunday had been firmly entrenched and staunchly defended by the Supreme Judicial Court. From reading the Joint Special Committee Report, it becomes clear that the question of what conduct should be barred or restricted on Sunday was a matter of enormous popular debate, in part because it was seen as “a problem whose difficulties have increased in proportion to the complexity of modem living and of modern thought.” 1907 Report of the Joint Special Committee at 6. Indeed, the Report asserts, “It is doubtful if any other one question than this, the observance of the Lord’s Day, or Sunday, has aroused such varied and widely differing expressions of opinion.” Id.
Yet, when one reads the Committee’s Majority Report, Minority Reports, and Supplementary Report, it is apparent that there was one issue that was not in question and for which there was absolute consensus — the need for every citizen to be assured a weekly day of rest. The Majority Report reads:
The committee are of one mind as to the need of a weekly day of rest for the preservation of the health and strength of the community, and would therefor recommend legislation to secure to all citizens the right of one clear day’s rest in seven. In so far as possible, Sunday should be maintained as the weekly day of rest; and whenever the needs of the community, public convenience or demand compel labor on Sunday, persons thus employed should be given a legal right to rest on some other day of the week.
Id. at 9.
The Majority Report goes on to recognize that, for an increasing number of Massachusetts citizens, Sunday was no longer the assured day of rest:
Although the day is generally observed throughout the Commonwealth as a day of rest, the growing complexity of modern life, particularly in centers of population, has greatly increased the demand for Sunday labor. Public convenience, rather than public necessity, strictly interpreted, has compelled a large number of citizens to labor on Sunday. Repeated exemptions have been made to allow the conduct of business on the Lord’s Day, as the convenience of the public has required, all of which have proportionately enlarged the scope of Sunday labor.
Id. The Committee estimated “that approximately 225,000 persons performed labor during seven days of the week, or parts of every day of the week.” Id. at 10.
“Though the committee had no doubt as to the importance of the Sunday or other day of rest from the point of view of health,” it still chose to consult eminent physicians to verify its importance “from the standpoint of medical science.” Id. The President of the Massachusetts Medical Society informed the Committee, “While from the nature of modern conditions there must be almost innumerable exceptions to the universal adoption of such a rule, yet the custom of abstaining from unnecessary labor on one day in the week is, in my personal opinion, a sensible and beneficial one.” Id. The Dean of the Tufts College Medical School told the Committee, "The general consensus of opinion among scientists seems to be that a day of rest, as indicated, is not only essential to hygienic living, but also advantageous from an economic point of view.” Id. The Committee’s Majority Report quoted at length Dr. T.T. Mutchler’s speech on “The Sanitary Aspect of Sunday Rest,” which was delivered before the International Sunday Rest Congress in St. Louis in 1904, which began, “It has been found upon careful investí- *351 gation, and proven by experience, that the human body needs not only the rest of the night, but, in addition, one full day’s rest in every seven, that it may be in the best condition.” Id.
The Majority Report made clear that it was not recommending legislation that persons be prohibited from voluntarily working seven days but rather was proposing legislation that ensured to everyone the right to have one day of rest in every week. The Report declared:
The committee do not assume that any legislation should prohibit persons from working seven days in the week, — although the wisdom of such prohibition might not be doubted, — but that every person should be secured in the right of one day of rest in every seven, and that the enjoyment of such right should in no manner jeopardize his employment.
Id. at 12.
The Committee observed that “[legislation to this end is in line with a more or less general movement throughout the civilized world.” Id. The Report included in its Appendix an article entitled, “Weekly Day of Rest,” which was republished from the Massachusetts Labor Bulletin, No. 36, of June 1905, issued by the Bureau of Statistics of Labor, which surveyed the Sunday laws in every state and various foreign nations. Id. at 41 et seq. (Appendix). The survey found that every state and territory in the United States had enacted legislation prohibiting Sunday labor or otherwise providing a weekly day of rest. Id. “The States and Territories having such legislation specify Sunday as the weekly day of rest, with the exception of California, the laws of which State specify that labor shall not be performed on ‘more than six days in seven.’ ” Id. The survey also revealed that “[o]ne day of rest in each seven, usually Sunday, is provided for in the laws of Austria, Denmark, Germany, Hungary, Rumania, Russia, Spain, and Switzerland, partial provision being made in Canada, England, Belgium and the Netherlands.” Id. at 42.
After declaring the need for legislation to ensure that every citizen be “secured the right of one day of rest in every seven,” the Majority Report then recommended that additional specific exemptions be made to the Sunday laws, recognizing that the courts have strictly interpreted what constituted works of “necessity or charity.”[3] Id. at 13. From reading the Report, there can be no doubt that the Committee recommended exempting more work from the prohibition of the Sunday laws only because it anticipated that the employees required to work on Sundays as a result of these exemptions would be entitled to another day off during the week.
The issue that divided the Committee was not the entitlement of every citizen to one day of rest in seven (as to that there was unanimity) but rather the extent to which secular recreation would be permitted on Sunday. As noted earlier, in 1904 the Legislature had enacted a law punishing with a fine anyone who “takes part in any sport, game, play or public diversion, except a concert of sacred music or an entertainment given in good faith by a religious or charitable society in aid of a religious or charitable purpose, the entire proceeds of which, if any, less only the necessary and reasonable expenses, not to exceed twenty-five percent of such proceeds, are to be devoted exclusively to a religious or charitable purpose . . .” Acts, 1904, c. 460, §2. The Committee’s investigation determined that many entertainment promoters had abused the exception for “an entertainment given in good faith by a religious or charitable society in aid of a religious or charitable purpose” by arranging for charitable organizations to sponsor their entertainment and paying them an agreed-upon amount (substantially less than the 75 percent of proceeds mandated by the statute) for their sponsorship. 1907 Joint Special Committee Report at 22 (Minority Report). The Majority Report recommended “that the legal barriers to reasonable and innocent pastime be removed,” but nonetheless provided against “professionalism, paid admissions, prizes, tokens, or gifts [so that] [t]he element of commercialism is entirely removed.” Id. at 16-17 (Majority Report). The Minority Report recommended that the existing restrictions on recreation be maintained and tightened. “To this end legislation is recommended whose purpose is to prohibit the shows now in vogue, and to permit only lectures, concerts or sacred or classical music, and concerts or entertainments given by public authority.” Id. at 23 (Minority Report). The Minority of the Committee believed that these recreational restrictions were more in keeping with the spirit of a day of rest and more consistent with popular opinion. Id. at 22-23 (“we believe it to be equally true that the basic principle of the observance of the day — a day of rest, a day upon which those so inclined may give themselves to religious exercises without disturbance, a day whose pleasures shall be none the less refreshing if less boisterous and hilarious — has not changed, and that its maintenance is the desire of a majority of the people”).
In January 1907, in his “State of the State” address to the Legislature, Governor Curtis Guild, Jr., perhaps anticipating the recommendations to emerge from the Joint Special Committee, declared:
European nations, not only from religious motives but from motives of social economy and of common humanity, have found it necessary to provide at least one day’s rest in seven. If women and children are to be forbidden night work, all workers of all ages and sexes should be given, as far as possible, the one day’s rest in seven especially demanded for a people of strenuous application and high-strung nervous activity. Where work of necessity and emergency enforces employment on Sunday, an oppor *352 tunity should be given the Sunday toiler for some other day of rest.
Message of Governor Curtis Guild, Jr. to the House and Senate, 1907 Senate Doc. 1.
The Legislature acted swiftly in response to the Governor’s proposal and the Special Committee’s recommendation to ensure a weekly day of rest for all but those employed in specifically excepted occupations. On June 28, 1907, the Legislature enacted Chapter 577 of the General Laws, which provided in Sections 1 and 2:
Section 1. Except in cases of emergency or except at the request of the employee, it shall not be lawful for any person, partnership, association or corporation to require an employee engaged in any commercial occupation, or in the work of any industrial process, or in the work of transportation or communication, to do on the Lord’s day the usual work of his occupation, unless such employee is allowed during the six days next ensuing twenty-four consecutive hours without labor.
Section 2. This act shall not be construed as authorizing any work on the Lord’s day not now authorized by law; nor as applying to farm or personal service, to druggists, to watchmen, to superintendents or managers, to janitors, or to persons engaged in the transportation, sale or de-liveiy of milk, food, or newspapers.
Acts, 1907, c. 577, §§1 & 2.
It is important to note that this new statute (Chapter 577) expressly supplemented, and did not in any way revise, the existing Sunday laws that, with many specific exceptions, prohibited anyone on Sunday from keeping “open his shop, warehouse or workhouse, or [doing] any manner of labor, business or work, except works of necessity and charity.” Acts 1904, c. 460, §2. Consequently, Chapter 577 applied only to the set of employees who were excepted from the Sunday laws and permitted to work on Sundays, less the subset of persons who were specifically excepted from the new statute and permitted because of the nature of their employment to work some part of every day. The terms “engaged in any commercial occupation, or in the work of any industrial process, or in the work of transportation or communication” were not separately defined, but they appear to be a more modem variant of the terms used in the Sunday laws — "shop, warehouse or workhouse" — and appear intended to be comprehensive in scope.
In 1909, the Legislature appears to have reorganized the various laws governing the employment of labor. Chapter 577 of the Acts of 1907 became, without any change in wording, Section 52 of Chapter 514 of the Acts of 1909. More substantively, as part of this reorganization, the Legislature also added Section 17, which expressly defined various terms, including “manufacturing establishments,” “mercantile establishments,” “mechanical establishments,” and “factory.” These definitions, for all practical purposes, continued unchanged through the present and are as described on pages 2-3 infra.[4]
Also in 1909, in a separate chapter, the Legislature made it far easier for an employer to satisfy the exception in the Sunday laws for “works of necessity” and keep his business open on Sunday. Under the newly enacted Chapter 420, any police chief in any town could issue a one-day permit allowing “necessary work or labor” to be performed on Sunday if, in the police chiefs judgment, the work “could not be performed on any other day without serious suffering, loss, damage, or public inconvenience.” Acts, 1909, c. 420.
In January 1913, the Massachusetts House of Representatives received two petitions for new legislation regarding a weekly day of rest. On January 14, 1913, Arthur Hill, Chairman of the Progressive Party Legislation Committee[5] proposed revisions to Section 52 of Chapter 514 of the Acts of 1909 that would have (1) prohibited an employer from permitting an employee to work on Sunday even if the employee had requested, and (2) added to the excluded occupations those employees who repair and maintain machinery and equipment that operates day and night in industrial establishments for the purpose of maintaining them in continuous operation. 1913 House Doc. No. 1085. The Massachusetts Association for Labor Legislation proposed a separate bill that would have created a new statute (1) allowing every person, except in specified occupations, employed in any “factory or mercantile establishment” “at least twenty-four consecutive hours of rest in every seven consecutive days,” (2) requiring an employer who operated on Sunday conspicuously to post a list of employees required to work on Sunday and designating a day of rest for them, and to file this list with the State Board of Labor and Industries, and (3) requiring every employer to keep a time book showing the hours worked by each employee on each day, which may be inspected by the State Board of Labor and Industries. 1913 House Doc. No. 1671. Both bills were referred to the House Committee on Labor.
In March 1913, the Committee reported a proposed bill, which effectively adopted virtually all the language in the bill proposed by the Massachusetts Association for Labor Legislation, with one notable exception — the scope of employers covered by the bill included those “engaged in carrying on any manufacturing or mercantile establishment,” which was broader than the scope proposed by the Association, whose bill covered those “engaged in carrying on any factory or mercantile establishment.”[6] House No. 2107, March 1913.
The Legislature in May 1913 enacted Chapter 619, which with minor changes was essentially the bill proposed by the Committee. Sections 1 through 3 of the new statute provided as follows:
*353 Section 1. Every employer of labor, whether a person, partnership or corporation, engaged in carrying on any manufacturing or mercantile establishment in this commonwealth as hereinafter defined, shall allow every person, except those specified in section two, employed in such manufacturing or mercantile establishment at least twenty-four consecutive hours of rest in every seven consecutive days. No employer shall operate any such manufacturing or mercantile establishment on Sunday, unless he shall have complied with the provisions of section three; but this act shall not authorize any work on Sunday not now authorized by law.
Section 2. This act shall not apply to (a) janitors; (b) watchmen; (c) employees whose duties include no work on Sundays other than (1) setting sponges in bakeries; (2) caring for live animals; (3) maintaining fires; (4) caring for machinery; (5) employees engaged in the preparation, printing, publication, sale or delivery of newspapers; (6) any labor called for by an emergency that could not reasonably have been anticipated.
Section 3. Before operating on Sunday, every employer shall post in a conspicuous place on the premises a schedule containing a list of his employees who are required or allowed to work on Sunday and designating the day of rest for each, and shall file a copy of such schedule with the state board of labor and industries. The employer shall promptly file with the said board a copy of every change in such schedule. No employee shall be required or allowed to work on the day of rest so designated for him.
Acts. 1913, c. 619, §§1, 2, & 3. While Section 2 of Chapter 619 excluded certain employees who were employed in manufacturing or mercantile establishments, Section 5 excluded certain establishments from the statutory definition of manufacturing and mercantile establishments, specifically “establishments used for the manufacture or distribution of gas, electricity, milk or water, hotels, restaurants, drug stores, livery stables or garages.” Id. at §5. Section 7 provided that “ [a]ll acts and parts of acts inconsistent herewith are hereby repealed,” but it specifically identified Chapter 420 of the Acts of 1909 as an act that “shall not be construed as repealed.” Id. at §7.
When one compares Acts 1913, c. 619 with Acts, 1907, c. 577, it emerges that both statutes expressly did not authorize any work on Sunday that was not otherwise authorized by law, and therefore focused only on ensuring a weekly day of rest for those employees for whom Sunday would not be their weekly day of rest. Apart from this fundamental similarity in purpose and scope, the 1913 statute made at least four substantive changes from the 1907 statute. First, under the 1907 statute, if an employee worked on Sunday, the employer was required to allow the employee a day off during the next six days. While this was understood to provide an employee one day’s rest in seven,[7] it actually only ensured one day off in twelve days, because the employee could be required to work without a day off from Monday of one week through Friday of the next week. Under the 1913 statute, the employee must truly be allowed one day of rest every seven days.
Second, under the 1907 statute, the employee could choose not to take a day of rest. Under the 1913 statute, if the employee works on Sunday, the employer must post the employee’s designated day of rest, and the employee is not allowed to work on that designated day. This change reflects the spirit of the bill proposed by Arthur Hill, and likely addressed legislative concerns that employees would be bullied by employers to “request” to work without a day of rest.
Third, the 1913 statute established an administrative procedure whereby the State Board of Labor and Industries could police employers’ compliance with their obligation to provide a weekly day of rest. If an employee worked on Sunday, the employer now had to post the alternative designated day of rest and file a copy with the Board, and had to keep a time book showing the hours worked each day by each employee, which would be available for inspection by the Board. Acts, 1913, c. 619, §§3 & 4.[8]
Fourth, while the 1907 statute identified “employees” covered by the statute through the nature of their work (“an employee engaged in any commercial occupation, or in the work of any industrial process, or in the work of transportation or communication”), the 1913 statute identified “establishments” that were covered, and required that “eveiy person” employed in such establishments (except those specifically exempted in the statute) must be given one day’s rest in seven. This change made good sense because it was establishments, not employees, that were obtaining exemptions from the Sunday laws. Therefore, while it may have been unclear after 1907 whether an accounting clerk working in an industrial factoiy was covered by the 1907 statute, there was no doubt that the clerk was covered by the 1913 statute, since the clerk plainly was employed in a manufacturing establishment.
EMC contends that this fourth change in the 1913 statute was intended to limit the scope of protection provided to employees in the 1907 statute, but there is nothing in the legislative histoiy and little in the language of the statute to suggest any such intent. To be sure, the Legislature in 1909 had defined various establishments, specifically manufacturing, mercantile, and mechanical establishments, but had included only manufacturing and mercantile establishments in the 1913 statute, leaving out mechanical establishments. It is apparent, however, that a manufacturing establishment was simply the legislative term of art in 1913 that was used to characterize the place where employees “engaged in the work of any industrial *354 process,” the language used in the 1907 statute, and that a mercantile establishment was the place where employees “engaged in any commercial occupation,” also language found in the 1907 statute.[9] The 1907 statute did not specifically speak of employees who worked in mechanical occupations but were not “engaged in the work of any industrial process,” so there was no need for mechanical establishments to be included in the 1913 statute to parallel the coverage of the 1907 statute. One cannot translate this to mean that the Legislature intended that employers in mechanical establishments be allowed to work their employees seven days a week. It is far more likely that mechanical establishments were not among those establishments that were being permitted under the Sunday laws to remain open on Sunday, so their employees’ day of weekly rest remained the traditional Sunday. Certainly, when the Legislature in 1913 intended to exempt employees and establishments from the requirement of one day’s rest in seven, it specifically identified them, based on the nature of the services they provided or the need to work part of each day.
Nor, considering the original proponents of the 1913 legislation — the Massachusetts Association for Labor Legislation and the Progressive Party Legislation Committee — is there any reason to believe that it was meant to narrow the scope of the 1907 statute. In fact, the 1913 legislation was plainly intended to provide greater protection to employees by forbidding them from being pressed by employers to “volunteer” to work seven days per week, and by providing the groundwork for the day of weekly rest to be enforced by the State Board of Labor and Industries. Nor, in light of the legislative consensus that appears to have been reached just six years earlier of the need for a weekly day of rest (and to ensure that, if the day of rest is not Sunday, another day be provided), is there any reason to believe that the Legislature intended to permit employers to require anyone other than the enumerated exempt employees from enjoying the spiritual, health, and recreational benefits of a weekly day of rest.
The 1907 statute became G.L.c. 149, §47 and, apart from an increase in the amount of the fine, remains unchanged today. Although Section 7 of the 1913 statute provided that “[a]ll acts and parts of acts inconsistent herewith are hereby repealed,” the Legislature must have determined that the 1907 statute was not inconsistent with the 1913 statute and therefore it remained in force.
The 1913 statute became G.L. 149, §48 and continued unchanged until 1935, when it was amended to ensure a weekly day of rest for watchmen and guards employed by banks, who previously had been exempted from the benefits of the weekly day of rest. Acts, 1935, c. 185. It was also amended in 1939, once again to add to the number of employees who were ensured a weekly day of rest. While the 1913 statute governed “every employer of labor . . . engaged in carrying on any manufacturing or mercantile establishment,” with the 1939 amendment, the statute governed “every employer of labor engaged in carrying on any manufacturing, mechanical or mercantile establishment or workshop." Acts, 1939, c. 235 (italics added). This Court knows of no legislative history explaining the reason for this amendment, but there can be no doubt that it enlarged the scope of workplaces covered by the weekly day of rest provision, perhaps because mechanical establishments and workshops were increasingly being allowed to remain open on Sunday.
In short, looking at the history and language of G.L.c. 149, §48 in the context of this Commonwealth’s long tradition of preserving a weekly day of rest, it is plain that the legislative intent in enacting this provision was to ensure that, apart from those specifically exempted, employees who work in establishments that may be permitted to remain open on Sunday be guaranteed an alternative weekly day of rest. Far more than today, the Legislature that enacted §48 believed in the importance of a weekly day of rest, not only for reasons of spiritual contemplation, but also for reasons of mental and physical health. While the Sunday laws had traditionally ensured that weekly day of rest, the demands of an industrializing society and the increasingly commercial recreational pursuits of a more prosperous citizeniy meant that a growing number of employees were working on Sunday, and the Legislature wished to ensure that these employees were not denied a weekly day of rest by having to work on Sundays.
Consequently, EMC misconstrues the intent of the statute when it contends that the Legislature in §48 intended narrowly to limit the weekly day of rest to those working in factories, sweatshops, and retail shops. It forgets that, since the 17th centuiy, Massachusetts laws have always ensured a weekly day of rest. It also forgets that Sunday was still the traditional weekly day of rest for the vast majority of employees in the Commonwealth when §48 was enacted in 1913, and that §48 expressly declared that its enactment “shall not be construed as allowing any work on Sunday not otherwise authorized by law.” G.L.c. 149, §48. It further forgets that the Legislature’s focus in 1913 was to preserve an alternative weekly day of rest for those who may be required to work on Sunday and, when exceptions needed to be made from this mandate, it carefully delineated those exceptions in the statute. The Legislature, when it enacted §48, plainly did not believe that the law should allow everyone to work seven days per week unless the statute specifically granted a weekly day of rest to a defined group of employees. On the contrary, the Legislature believed that the law should prohibit everyone from being required to work seven days per week unless the *355 statute expressly allowed a defined group of employees to be denied a weekly day of rest.
Was Bujold Employed in a Mechanical Establishment?
Once we understand that the Legislature intended that the scope of employees protected by §48 be broadly construed, it becomes relatively simple to determine whether, based on the undisputed evidence in the record, Bujold was employed in a mechanical establishment. As a Technical Support Engineer, according to his EMC job description, it was among his “principal duties and responsibilities” that he:
Applies technical expertise using standard operating and diagnostic protocols to quickly resolve very complex systems level technical support issues that are negatively impacting product performance at EMC customer sites in support of internal and external customers. Uses standard internal and external diagnostic test equipment and product trace and logging procedures. Follows generally accepted protocols or procedures in diagnosing and resolving very complex customer issues . . .
EMC Corporation Job Description, Kevin Bujold, Technical Support Engineer 2. Bujold’s testimony helps us to cut through the technical jargon of his job description and recognize in plain English what it means: when EMC customers had technical problems with the products he supported — primarily EMC’s Symmetrix disk array — he helped to solve them. The Symmetrix is a massive computer, both in terms of size (roughly the size of a refrigerator) and in storage capacity (its top model stores the equivalent of 24,000 standard desktop computers with 50 GB drives), that can be joined in arrays of multiple machines (hence, the term Symmetrix disk array) to store huge quantities of a company’s electronic data. Bujold was generally able to repair problems with a customer’s Symmetrix computer by remotely accessing it from the desktop computer at his desk on the second floor of EMC’s “HOP II” building at 171 South Street in Hopkinton[10] At times, however, Bujold needed to work “hands on” with a Symmetrix computer to resolve a technical issue, and he would then work in the Product Verification Test Lab in HOP II, where many Symmetrix computers were located.
As noted earlier, a “mechanical establishment” is defined in G.L.c. 149, §1 as “any premises, other than a factory as above defined, where machinery is employed in connection with any work or process carried on therein.” There is no dispute that the provision of technical support to customers was part of the work that was carried on within the premises where Bujold worked at 171 South Street. Nor is there any dispute that Bujold used his desktop computer and, at times, the Symmetrix computers in the Product Verification Test Lab to resolve technical problems that EMC customers had with their Symmetrix disk arrays. Therefore, the only dispute is whether Bujold’s use of a computer, including a computer as massive and as powerful as the Symmetrix computer, constitutes the employment of machinery in connection with any work or process carried on inside 171 South Street.[11] This Court, as a matter of law, finds that it is.
The word “machinery,” used in the definition of “mechanical establishment,” is not itself defined in the statute. The American Heritage Dictionary of the English Language defines “machinery” as “collectively, machines or machine parts.” Ninth Printing, 1971 at 780. See also Webster’s New World Dictionary (3rd College Edition, 1988) at 810 (defining “machinery” as “machines collectively” or “the working parts of a machine”). A “machine” in the American Heritage Dictionary of the English Language is defined as “any system . . . formed and connected to alter, transmit, and direct applied forces in a predetermined manner to accomplish a specific objective, such as the performance of useful work.” Supra at 780. An alternative definition, interesting enough, is “any system or device, such as an electronic computer, that performs or assists in the performance of a human task.” Id. (emphasis added). See also Webster’s New World Dictionary at 810 (defining a “machine” as “a structure consisting of a framework and various fixed and moving parts, for doing some kind of work,” using the example of a sewing machine).
Applying these dictionary definitions, which reflect common parlance, it is plain that a computer, especially a computer of the size, complexity, and power of the Symmetrix disk array, is a “machine.” Indeed, this Court notes that the company which essentially gave birth to the computer during World War II, when the Automatic Sequence Controlled Calculator was developed in 1944 in conjunction with Harvard University, was the International Business Machines Corporation. (“IBM”). See http://www-03.ibm.com/ibm/his-toiy/history/decade_1940.html. IBM had formerly been named the Computing-Tabulating-Recording Company (“C-T-R”), but changed its name to IBM in 1924 when its business had grown to include the manufacture and sale of electric accounting machines, autograph recorders, and school time control systems. See http://www-03.ibm.com/ibm/his-tory/histoiy/decade_1920.html. In short, a computer has always been characterized as a business machine.
It is equally plain that this machineiy — this collection of business machines — was routinely employed at the premises of the HOP II building in connection with work or processes carried on within those premises. Indeed, Bujold’s work was to resolve problems that arose with the Symmetrix machines owned by EMC customers, and he performed this work both through his own desktop computer (another machine), from which he could remotely access the customer’s Sym-metrix, and occasionally through the use of the Sym-metrix machines within HOP II at the Product Verification Test Lab. In short, Bujold, as a technical *356 support-engineer, used machines at the HOP II premises to fix machines.
EMC argues for a far narrower definition of a “mechanical establishment,” but its argument runs contrary to both the spirit and the letter of §48. Having already exhaustively discussed the spirit of that weekly day of rest law, I will focus on the letter of the definition of “mechanical establishment.” From that definition, it is plain that mechanical establishments include more than factories, defined as “any premises where mechanical power is used in aid of any manufacturing process there carried on,” because the definition of mechanical establishment specifically states that factories, which otherwise would be mechanical establishments, are not meant to be included within the definition of mechanical establishments.[12] Rather, a mechanical establishment includes “any premises, other than a factory . . . , where machinery is employed in connection with any work or process carried on therein.” G.L.c. 149, §1 (emphasis added). The enormous breadth of this definition is understandable when one recognizes that the Legislature in 1939 was closing a hole in the law that had been left from the original 1913 legislation, and meant to extend a weekly day of rest to virtually all who may be required to work on Sunday.[13]
Therefore, this Court finds as a matter of law that EMC was engaged in carrying on a mechanical establishment at its HOP II facility in Hopkinton, where Bujold had been employed, and that the weekly day of rest law, G.L.c. 149, §48, therefore protected Bujold from being required to week seven consecutive days. Consequently, EMC’s motion for summary judgment must be denied.[14]
ORDER
For the reasons stated above, this Court hereby:
1. FINDS as a matter of law that EMC was engaged in carrying on a mechanical establishment at its HOP II facility in Hopkinton, where Bujold had been employed, and that the weekly day of rest law, G.L.c. 149, §48, therefore protected Bujold from being required to week seven consecutive days; and
2. ORDERS that EMC’s motion for summary judgment is DENIED.
3. Counsel shall confer with each other and the session clerk regarding a prompt, but mutually agreeable, date for a litigation control conference to discuss the consequences of this decision on the balance of this litigation.

Bujold also alleged that EMC -wrongfully terminated his employment in violation of public policy. On January 22, 2007, this Court allowed EMC’s motion dismissing this claim.

A “factory” is defined as “any premises where mechanical power is used in aid of any manufacturing process there carried on.” Id.

The Committee also proposed that the standard exception in the Sunday statute for “works of necessity and charity” be changed to “works of necessity or chanty," noting that the courts have already interpreted the statute in this fashion. Id. (italics added).

The only change was to the definition of “mercantile establishments,” which was subsequently amended specifically to include laundries and dry cleaners. G.L.c. 149, §1.

New York Times, “State Newspaper Inquiry: Massachusetts Progressive Questions Accuracy of News Reports,” Feb. 8, 1913.

A “factory” is defined as premises where mechanical power is used in aid of any manufacturing process. A “manufacturing establishment” is essentially any premises used for the purpose of manufacturing, regardless of whether mechanical power is used or not to aid the process. See G.L.c. 149, §1.

Indeed, the typed annotation to this section in the margin of the 1907 Act declares, “Employees to be allowed one day’s rest in every seven days.” Acts, 1907, c. 577, §1.

Forbidding employees from volunteering to work on that designated day of rest no doubt made it easier for the Board to enforce employer compliance with the new law.

It should also be remembered that the Legislature in 1913 revised the bill that came out of the House Committee on Labor, which included employees in any “factory or mercantile establishment,” to include employees in any “manufacturing or mercantile establishment.” Since a factory is a subset of a manufacturing establishment, this change enlarged the scope of establishments covered by the legislation.

Shortly before his termination, Bujold’s office was moved to the third floor of the wing that connected the “HOP I” and “HOP II” buildings, but he continued to perform most of his technical support work from his desktop computer.

It does not matter here whether the “premises” is defined as 171 South Street or simply the HOP II building at 171 South Street, because the Symmetrix computers, as well as Bujold’s own desktop, were located in the HOP II building.

A “factory” instead would be deemed a “manufacturing establishment.”

EMC spends a great deal of its brief noting that Bujold’s attorney had been quoted in Lawyer’s Weekly as saying, ‘The statute [referring to G.L.c. 149, §48] was designed to protect people working in sweatshops, so I think it might be a stretch for a law firm to be considered a manufacturing, mechanical or retail establishment.” Barbara Rabinovitz, “Sweating It Out,” Mass. Lawyers Weekly, Feb. 13, 2006, at 5. EMC then goes on to argue that, if the HOP II building is deemed a “mechanical establishment,” so, too, would EMC’s law firm, Skadden, Arps, Slate, Meagher & Flom, LLP, which would mean that the law firm’s associates and staff could not be required under §48 to work seven days per week, which it apparently considers to be so outlandish a proposition that no court should even consider the possibility. This Court is not moved by the logical or persuasive force of this argument for at least two reasons. First, as discussed at length earlier, Bujold’s attorney erred in thinking that the Legislature’s focus when it enacted §48 was limited to “protect people working in sweatshops,” so the premise of the argument is wrong. Second, EMC is not operating a law firm, so this Court need not decide whether a law firm, because of its use of computers, would also be deemed a mechanical establishment protected by the weekly day of rest law.

In view of this Court’s finding that EMC was carrying on a mechanical establishment where Bujold had been employed, this Court need not consider whether that same facility was also a mercantile establishment.